896 A.2d 359

**Anthony H. BUTLER and Donald N. Lowery**

v.

**STATE of Maryland.**

**No. 83, Sept. Term, 2005.**

Court of Appeals of Maryland.

April 13, 2006.

Michael R. Braudes, Asst. Public Defender (Nancy S. Forster, Public Defender, Sherrie B. Glasser, Asst. Public Defender, on brief), for petitioners.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

CATHELL, J.

This case concerns the propriety of a trial judge's comments after jury deliberations had commenced in a criminal trial, in responding to a jury note stating that an unidentified juror did not trust the police under any circumstances. On July 3, 2003, a jury found Anthony H. Butler guilty of distribution of a controlled dangerous substance, possession with intent to distribute a controlled dangerous substance, possession of a controlled dangerous substance, and three counts of conspiracy accompanying the previously mentioned convictions. The jury also found Donald N. Lowery, Butler's co-defendant, guilty of conspiracy to distribute a controlled dangerous substance, conspiracy to possess with intent to distribute a controlled dangerous substance, and conspiracy to possess a controlled dangerous substance. Lowery was acquitted of the charges of distribution, possession with intent to distribute, and possession. The Court of Special Appeals, in an unreported opinion, affirmed the convictions. Butler and Lowery, petitioners, filed a joint petition for writ of certiorari, which this Court granted on November 10, 2005. *Butler v. State,* 389 Md. 398, 885 A.2d 823 (2005).

The following question is presented for our review:

"Where in a prosecution based upon police testimony the jury first indicated that it was deadlocked and subsequently that 'We have one juror who does not trust the police no matter the circumstance,' did the trial court improperly coerce a guilty verdict by instructing the jury that such a

sentiment should have been disclosed during the jury selection process, 'and if anybody deliberates with that spirit now, I suggest they might be violating their oath'?"

We find that the trial judge improperly addressed the jury in such a way that the defendants may have been denied their right to a fair trial; therefore, we reverse the Court of Special Appeals and remand for a new trial.

## I. Facts

This case arose from a Baltimore City Police Department undercover operation entitled "Red–E–Rock," which took place in 2002. The purpose of the operation was to arrest as many "street-level drug dealers" as possible. Undercover police officers would purchase drugs from dealers, but deferred the arrests until a later date to allow the same police officer to make multiple purchases in the same locations.

On February 7, 2002, at approximately 12:55 p.m., Detective Will Farrar, an undercover agent participating in the operation, met a man who claimed to have "green tops." Detective Farrar understood "green tops" to mean that the man, who the detective identified as petitioner Lowery, had cocaine for sale. Lowery and the detective then walked down the street and approached another individual identified by Farrar as petitioner Butler. Butler asked Detective Farrar how many green tops he wanted, to which the detective responded that he wanted one. Butler gave Detective Farrar a small packet, which was later determined to contain not cocaine, but .007 grams of heroin, and the detective gave Butler a twenty dollar bill in return.

Detective Farrar left the scene and provided a description of the two men to Detective David Clasing and Sergeant Mark Janicki. The officers found Butler and Lowery at the place where Detective Farrar had stated the exchange took place. The officers asked petitioners to produce photo identifications, to which they complied. Detective Farrar drove by the location while the officers were questioning petitioners and positively identified Butler and Lowery. Petitioners were not

arrested at that time. Detective Farrar gave the following explanation for the delay in the arrests:

"[A]fter the buy is made, [the suspects] are identified, positively identified. We go back, do reports, get a case folder ready. After the project has ended, the case folders are turned over to the State's Attorney's office. State's Attorney's office gets the paperwork ready for indictment. It's taken to the Grand Jury. The case is read in front of the Grand Jury and if they see sufficient evidence to issue—

. . .

If they see sufficient evidence in what they hear to issue an indictment warrant, they'll issue an indictment warrant.

. . .

[State:] Detective, why aren't the dealers—your goal wasn't to arrest but why weren't they arrested?

[Detective Farrar:] Because the detail lasts anywhere from 30 to 45 days or longer. If we arrest them, it limits the job that I can do because if I make a buy and they arrest them that day, they get out the next day on bail or whatever. They will be back out on the corner, then I can't go back in that area because they know that I'm the one who bought from them and I'm the reason why they got arrested. It becomes a safety issue. It limits my job that I can go back into that area. If we don't make an arrest, we make a positive ID. It allows me to go back into this area as long as this project is kept going. So, I can return to this area later on that day, the next day for weeks at a time. However long the project runs."

On March 7, 2003, a Grand Jury issued an indictment against the petitioners and, on March 20, 2002, the State's Attorney filed a motion to issue a warrant for their arrest. The Circuit Court issued the warrants on March 22, 2002. Petitioner Lowery was arrested on June 6, 2002; petitioner Butler was arrested on August 9, 2002.

Petitioners' trial commenced on July 1, 2003. During voir dire, the trial judge asked the following question to the prospective jurors:

"Would any member of the panel automatically believe or automatically disbelieve the testimony of a law enforcement officer strictly because of that officer's occupation or training? Or if given the choice between the testimony of a civilian and a law enforcement officer, automatically believe one over the other just because one is a law enforcement officer[?]"

The judge also asked whether the prospective jurors were related to a law enforcement officer or officer of the court. To this question, no one who became a juror responded. Some of the prospective jurors came forward and provided relevant information to the judge and counsel. At the end of voir dire, a jury was selected and the State presented its case, which consisted of identifying and admitting into evidence the substance allegedly purchased from the petitioners, a copy of the twenty dollar bill used to pay for the drugs, and testimony from five witnesses-four police officers, and the police department's chemical analyst as an expert. At the close of the State's case petitioners' motions for judgment of acquittal were denied and the defense rested without calling any witnesses on behalf of the petitioners.

The trial judge instructed the jury and closing arguments were heard. Before the jury retired for deliberations the trial judge explained to the jury, among other things, that:

"If you need help [during] the time you're deliberating, just write a note saying you need help. For instance, if you need to deliberate for an hour or so and decide you don't want to go any further, then write us a note saying, please excuse us for the night. Then I'll give you instructions on how to come back tomorrow morning or afternoon or whenever you want to come back."

The jury was then sent out for deliberations. Approximately four and a half hours later, the trial judge stated: "We have a note from the jury. It says group can't agree or don't agree."

The following exchange then took place out of the presence of the jury:

"[THE COURT]: Starting with [Butler's counsel], how do you wish to handle that?

[Butler's counsel]: Your Honor, I wish for a mistrial to be declared.

THE COURT: [Lowery's counsel]?

[Lowery's counsel]: I concur, Sir.

THE COURT: [State].

[State]: I would ask for an Allen charge. The modified Allen charge.

THE COURT: Any argument with respect to that?

[Butler's counsel]: Your Honor, I think with an Allen instruction, we are talking about 8:30 at night. The Jury has deliberated at length and the court did, in fact, give them instructions that if they were unable to make a decision, come back tonight and give them the alternative for coming back tomorrow and the Jury has indicated they have not reached a decision.

THE COURT: [Lowery's counsel]?

[Lowery's counsel]: I concur. And I believe that an Allen charge tonight would be unduly stressful on them.

THE COURT: All right. I agree that the Allen charge would be coercive if I give it tonight when it is 8:30 and they are tired. Therefore, *I will allow them to break for the evening and the first time they tell me they can't agree, at that point I'll give them an Allen charge, unless they say further deliberations would not be fruitful in reaching a verdict.* I don't know to what extent this is fatigue or to what extent this is whatever, but four and a half hours of deliberation in a case that took as long as this did is not enough. So bring the Jury out and tell them to bring their belongings." [Emphasis added.]

The jury was then brought into the court room, the trial judge cautioned them against speaking to anyone about the case or

trying to conduct any research on the case overnight and released them until the following morning.

When the jury returned the next morning to renew deliberations, the trial judge received a note requesting that the jury be allowed to watch the videotape of closing arguments. Both petitioners' counsels objected to the request. The trial judge conducted some research on the issue. While the trial judge was determining whether to allow the request to view the tapes, another note was received which stated: "We have one juror who does not trust the police no matter the circumstance." The trial judge asked counsel for their input on the problem generated by the new question, and the following discussion ensued:

"[Butler's counsel]: Your Honor, I think with that note in conjunction to the request, again, my fear is that, again, they are going to use the closing arguments, which is not evidence, to coerce somebody who is reluctant to believe the police into recapitulating their verdict, whatever it may be. And I think at this point it would be coercive and it would be unfair to play back the closing argument. This is not evidence. They didn't request evidence. They didn't request clarification as to evidence or the law. They are to apply the evidence to the facts to the law and not—they are not reviewing evidence or facts or law, they are reviewing argument and I don't think that's fair at this point, Your Honor.

THE COURT: [Lowery's counsel]?

[Lowery's counsel]: I adopt and further say to Your Honor that you ought to ask them, that being so, are you deadlocked, you cannot reach a decision?

THE COURT: [State]?

[State]: Your Honor, I would ask you to proceed at this time. They don't say they are deadlocked. I think that this may make a difference to play the closing arguments. It's not additional evidence, it is a repeat of what was said during the trial. There is nothing prejudicial about it. It is clearly still within your discretion and I believe that in the

interest of justice, the case did take two days. They did not deliberate more than two hours last night by the time the juror got back from moving his car. They have been deliberating for the last two hours for this information. I think that, based upon that, they should have one chance to observe [the tape of closing arguments] and then if they send us a note later, that would be different. But they are not saying they are deadlocked.

THE COURT: *The note is somebody's perception on the jury. If that perception is accurate, it means that somebody on the jury committed perjury in the voir dire. I don't wish to think ill of my fellow citizens. I don't believe that necessarily one juror would never trust the police under any circumstances. I think that may just be an exhausted and frustrated reaction. I think that further repetition of the closing argument may bring more harmony to the jury in a non-coercive manner. So rather than give an Allen charge I will give the jury what they want which is about basically to review the closing arguments.*

Mr. Needleman? [Lowery's counsel]

[Lowery's counsel]: Well Mr. Lowery would say that, Your Honor, I don't know if Your Honor has even thought about this, but *maybe as a result of this case, they can't believe the police. May be that should be your rationalization. Not that anybody committed perjury.*

THE COURT: Even if it were—no, no, no, I didn't say any witness committed perjury *I'm saying the juror committed perjury.*

[Lowery's counsel]: The juror. They see what they saw in this courtroom and they now come to this unalterable conclusion.

THE COURT: I know, but I don't think that a repetition of the closing arguments will be coercive in attempting to see if we can achieve harmony among them.

[Lowery's counsel]: Absolutely it will, Your Honor. I know you are about going to rule for the State, I understand that, but Mr. Lowery objects.

THE COURT: All right, the issue is preserved.

[Butler's counsel]: We note our objection also, Your Honor.

THE COURT: All right. Bring the Jury out please.

. . .

Madam Forelady, ladies and gentlemen we received two notes from you. The first note occasioned lengthy legal research and argument. The second note we're essentially going to ignore. It says we have one juror who does not trust the police no matter the circumstance. Anybody who had felt that way should have said so in voir dire so a challenge could have occurred, *and if anybody deliberates with that spirit* **now**, *I suggest they might be violating their oath.*

[Lowery's counsel]: We object to that, Your Honor.

THE COURT: The objection is overruled.

We have determined, after extensive legal argument and somewhat of a case of first impression in Maryland, that it would be appropriate for you to review the closing arguments and we'll allow you to do so at this time.

[Lowery's counsel]: Before that's done, can we approach?

THE COURT: You may.

. . .

(Whereupon, the parties approached the bench and the following proceedings ensued on the record.)

[Butler's counsel]: I join in the objection by [Lowery's counsel].

[Lowery's counsel]: On behalf of Mr. Butler and Mr. Lowery, we move for a mistrial. It is my—

THE COURT: Go ahead.

[Lowery's counsel]: *I firmly believe that His Honor's sua sponte comment to a juror as a result of the note—it was not requested by the State, it was not requested by the defense and it did nothing but put a chilling effect on that juror to be cornered out, to be isolated and, therefore, to*

*give up that juror's personal opinion as to the evidence in this case. And, like I said prior to that, it may be as a result of what that juror saw during the trial that caused him to have that kind of thinking and not during the voir dire process. So—*

THE COURT: Whether it's during the voir dire or whether it's during the trial, if it's not trust, no matter the circumstance, then the person should be challenged for cause. We're in a position now where it's too late to challenge for cause other than to have a mistrial.

[Lowery's counsel]: But you scolded that juror, Your Honor.

THE COURT: If the jur[or] persists in her illegal attitude, then there will ultimately be a mistrial, but in the event that the juror wants to rethink what her legal obligation is after what I consider to be a very gentle mention of that fact, because I didn't accuse anybody of anything, I said the note said, and if it were true, it might suggest that frivolity and hopefully they will listen to the arguments again and in rethinking, even without an Allen charge, might mean that whoever's perception this is isn't borne out. So, if somebody got up and said I don' t trust the police no matter what and I said you can't do that, I think your argument might be better taken. But nobody is admitting to it and, you know, I don't think you can empirically say that it was coercive or chilling. We'll now watch the video.

[Lowery's counsel]: I just thought that manifest necessity had been reached, thank you, Sir.

[Butler's counsel]: I join in the objection, Your Honor." [Emphasis added.]

After that exchange, the jury was allowed to watch the video of the closing arguments. The jury then resumed deliberations,[1] found Butler guilty on all counts and Lowery guilty on the conspiracy counts.

---

1. We were unable to ascertain from the record how long it took for the jury to reach a verdict after reviewing the tapes of closing arguments and after the one juror was admonished by the judge.

180

## II. Discussion

 The right to a jury trial under the Maryland Constitution was described by Judge Raker recently in *Stokes v. State,* 379 Md. 618, 843 A.2d 64 (2004), where she stated for the Court:

"The right to a trial by jury, of twelve persons, has been part of the common law for centuries, along with the requirement of unanimity. The right to trial by jury is guaranteed by the Maryland Declaration of Rights and the Maryland Rules, as well as the United States Constitution. *See Kawamura v. State,* 299 Md. 276, 473 A.2d 438 (1984). Article 5 of the Maryland Declaration of Rights provides, in pertinent part, 'That the Inhabitants of Maryland are entitled to ... trial by Jury....' Article 21 of the Declaration of Rights provides, in pertinent part, 'That in all criminal prosecutions, every man hath a right ... to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.' Article 23 of the Declaration of Rights provides, in pertinent part, 'In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction.' Article 24 of the Declaration of Rights provides, 'That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges ... or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.' The reference to 'jury' in our organic laws, refers to a jury as constituted under the common law, unless the contrary plainly appears. *See State v. Kenney,* 327 Md. 354, 361, 609 A.2d 337, 340 (1992); *State v. Ledger,* 175 Wis.2d 116, 499 N.W.2d 198, 202 (Ct.App. 1993) (citing *State v. Gollmar,* 32 Wis.2d 406, 145 N.W.2d 670, 671–72 (1966)). *Cf. Bryan v. State Roads Comm'n,* 356 Md. 4, 14, 736 A.2d 1057, 1061 (1999) (holding that the 1992 amendment to Article 5 of the Maryland Declaration of Rights permits a six person jury in all cases except criminal cases); *Thompson v. State,* 278 Md. 41, 53, 359 A.2d 203, 210 (1976) (noting that common law right to a jury trial

exists absent a rule or statute taking the right away where it would be constitutionally permissible to do so)."

*Id.* at 625–26, 843 A.2d at 68–69. One of the requirements embodied in the right to a jury trial is that of a unanimous verdict. With respect to unanimity we have stated: "The verdict is the *unanimous* decision made by a jury and reported to the court, on the matters lawfully submitted to them in the course of the trial. *Unanimity* is indispensable to the sufficiency of the verdict." *Smith v. State,* 299 Md. 158, 163–64, 472 A.2d 988, 990 (1984) (quoting *Ford v. State,* 12 Md. 514, 549 (1859)) (internal quotations omitted); *see also Caldwell v. State,* 164 Md.App. 612, 635, 884 A.2d 199, 212 (2005) ("The concept of unanimity ... embraces not only numerical completeness but also completeness of assent, *i.e., each juror making his or her decision freely and voluntarily,* without being swayed or tainted by outside influences.") (emphasis added). In the case *sub judice,* it is possible, if not likely, that at least one of the jurors may have been coerced into joining the majority's verdict by the admonition of the trial judge.

 A judge's role during a jury trial makes his or her statements subject to a high level of scrutiny, when they may result in an unfair advantage to either party, because, as the Court has previously stated:

" 'We *must zealously guard against any actions or situations which would raise the slightest suspicion that the jury in a criminal case had been* [improperly] *influenced ... so as to be favorable to either the State or the defendant. Any lesser degree of vigilance would foster suspicion and distrust and risk erosion of the public's confidence in the integrity of our jury system.'* "

*Jenkins v. State,* 375 Md. 284, 339–40, 825 A.2d 1008, 1041 (2003) (quoting *State v. Wilson,* 314 N.C. 653, 656, 336 S.E.2d 76, 77 (1985)). Furthermore, in regards to the trial judge's actions, we explained in *State v. Hutchinson,* 287 Md. 198, 411 A.2d 1035 (1980):

"The trial judge is the central figure at the trial, having the chief responsibility of steering the jury through the maze of

evidence. In such role, the trial judge may *influence* the jury by the inflection of his voice, his words, his conduct and his assessment of the evidence, if revealed. Thus, the trial judge must remain ever vigilant in order to avoid conveying any idea as to what he thinks the jury's verdict should be or suggesting the slightest partiality."

*Id.* at 206, 411 A.2d at 1040; *Johnson v. State*, 352 Md. 374, 385–86, 722 A.2d 873, 878 (1999). The judge's actions need not be intentional to inappropriately influence the jury. In *Hutchinson*, for example, the trial judge failed to instruct the jury that they could find the defendant "not-guilty," although a "not-guilty" option was included in the verdict sheet used by the jury. The Court found that the judge's failure to properly instruct the jury on the possibility of a "not-guilty" verdict constituted reversible error. *Id.* at 208, 411 A.2d at 1041.

In the present case, the trial judge stated that he considered the statement to the jury "a very *gentle* mention of" the alleged illegality of the juror's position and that, therefore, the statement was not coercive. As gentle as the admonishment may have appeared to the judge, it may have carried great weight in the minds of the jurors (especially the mind of the juror who allegedly held certain views about police officers) who may be very susceptible to a judge's words and instructions. Furthermore, the judge acknowledged that his purpose in making the statement was to advise the juror to "rethink her legal obligation." Such "rethinking" could have led the juror to put aside his or her firmly held opinion and to vote with the majority even if the juror retained his or her prior position in respect to his or her disbelief of the police either in general or in the instant case. As explained *infra*, trial judges must carefully avoid making the types of remarks which could lead to the improper coercing of a juror into acquiescence with a majority.

We must also note that, in urging that juror to consider setting aside his or her opinion as to the credibility of the police, the judge in effect may have compromised the well recognized principle that the credibility of witnesses is entirely within the province of the trier of fact, i.e., the jury in this

case. *Brown v. State*, 368 Md. 320, 793 A.2d 561 (2002). Consequently, whether the juror's opinion was based upon his or her preconceptions about the police in general or, as suggested by petitioners, was born out of the juror's consideration of the testimony of the officers in this case, it is beyond the power of the trial judge to suggest, *while the jury is in the midst of deliberations,* that such opinions are impermissible. The judge may well have been correct that, had the juror stuck to his or her opinions, there might have been a hung jury or a mistrial. That conclusion, however, did not allow him in the deliberation stage to admonish the unknown juror for the views he or she might have held.

Trial judges can improperly influence the jury at different times throughout the trial. A trial judge may prejudice the jury during the presentation of either party's case through his or her interactions with counsel and witnesses. *Johnson,* 352 Md. 374, 722 A.2d 873 (holding that the trial judge exerted improper influence by, in the presence of the jury, ordering the arrest of defense counsel, interrupting counsel frequently, holding counsel in contempt); *Vandegrift v. State,* 237 Md. 305, 311, 206 A.2d 250, 254 (1965) ("The questioning by the trial judge showing his disbelief of the witness' testimony was beyond the line of impartiality over which a judge must not step."). The trial judge may improperly instruct the jury giving an advantage to either party. *Thompson v. State,* 371 Md. 473, 810 A.2d 435 (2002); *Hutchinson,* 287 Md. 198, 411 A.2d 1035; *Burnette v. State,* 280 Md. 88, 371 A.2d 663 (1977). In addition, a trial judge may, as in the case *sub judice,* improperly respond to questions posed by the jury during deliberations. Finally, the trial judge may coerce the jury during a post-verdict hearkening or polling process. *Bishop v. State,* 341 Md. 288, 670 A.2d 452 (1996); *Lattisaw v. State,* 329 Md. 339, 619 A.2d 548 (1993).

The exact situation in the case at bar has not been presented to the Court in our previous cases. We have, however, extensively discussed coercion in cases involving *Allen*-charges and cases involving "polling." In that respect, we have stated that trial judges' "conduct during a trial has a direct bearing

on whether a defendant will receive a fair trial because their opinion or manifestations thereof usually will significantly impact the jury's verdict." *Johnson*, 352 Md. at 385, 722 A.2d at 878 (quoting *Jefferson–El v. State*, 330 Md. 99, 105–06, 622 A.2d 737, 740–41 (1993)). The present petitioners contend that the trial judge's admonition to the jury denied them a fair trial. They likened the trial judge's statement that "[a]nybody who had felt that way should have said so in voir dire so a challenge could have occurred, and if anybody deliberates with that spirit now, I suggest they might be violating their oath" to the well-known *Allen*[2] charge sometimes given to deadlocked juries to encourage them to come to an agreement. The trial judge in the present case did not issue an *Allen*-type instruction during the deliberations.[3] The coercive nature of the statement he *sua sponte* gave, however, amounted to a clear deviation from the allowed communications between judge and jury *during deliberations* . Once the time for challenges is past and the evidentiary stage is over, if such an allegedly tainted juror is discovered during the deliberation process, the usual recourse will be for the court to declare a mistrial, or, if further investigation by the court affirms the

---

**2.** *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

**3.** The trial judge did issue Maryland Pattern Jury Instruction (MPJI–Cr) 2:01 in instructing the jury before closing arguments. This instruction was approved in *Thompson* because it does not contain any of the coercive language found in the original *Allen* charge. *Thompson*, 371 Md. at 485, 810 A.2d at 442. The instruction read in the present case stated:

"The verdict must be the considered judgment of each of you[.][I]n order to reach a verdict, all of you must agree. Your verdict must be unanimous. You must consult with one another and deliberate with a view to reaching an agreement[,] if you can do so without violence to your individual judgment.

"Each of you must decide the case for yoursel[f,] but do so only after a[n impartial] consideration of the evidence with your fellow jurors.

"During the deliberations, do not hesitate to reexamine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict."

expressed stance of such a juror, a mistrial on the motion of a party. *See Bishop,* 341 Md. at 294, 670 A.2d at 455; *Lattisaw,* 329 Md. at 347, 619 A.2d at 552. But attempting to address the issue by coercion of that juror is inappropriate.

The State responds by stating that the trial judge did not give an *Allen*-charge in this case and that, even if the trial judge's statement can be considered analogous to the *Allen*-charge, the statement was not coercive. Originally, the *Allen*-type charge was given when the jury communicated to the trial judge that they were deadlocked. *Mayfield v. State,* 302 Md. 624, 490 A.2d 687 (1985); *Burnette,* 280 Md. 88, 371 A.2d 663; *Leupen v. Lackey,* 248 Md. 19, 234 A.2d 573 (1967). Eventually, however, the Court allowed the use of an *Allen*-type instruction to the jury before deliberations commenced, in addition to the use of the *Allen*-type instruction under some circumstances if the jury appeared deadlocked. *Thompson,* 371 Md. 473, 810 A.2d 435; *Goodmuth v. State,* 302 Md. 613, 490 A.2d 682 (1985); *Kelly v. State,* 270 Md. 139, 310 A.2d 538 (1973).

The current state of the law with respect of the *Allen*-type charge to the jury was explained in *Thompson.* Judge Battaglia, writing for the Court, described the evolution of the *Allen*-charge, making specific reference to the fact that the Court *disapproved of the coercive language utilized in the original Allen instruction.* She went on to state that in *Burnette* "we disavowed its use because we determined that the language was coercive and, as such, an impermissible interference with the province of the jury." *Thompson,* 371 Md. at 483, 810 A.2d at 441. Furthermore, in *Goodmuth* "we noted that the guidance given in *Burnette* was applicable to pre-deliberation instructions as well as to those given to deadlocked juries." *Thompson,* 371 Md. at 483, 810 A.2d at 441–42.

The trial judge in *Thompson* instructed the jury with an "attitude of the jurors" instruction as opposed to the "duty to deliberate" Maryland Pattern Jury Instruction (MPJI–Cr) 2:01. The instruction given deviated from the standard in-

struction in that it stated: " '[T]he final test of the quality of your service will lie in the verdict which you return to the Court, not in the opinions any of you may hold as you retire.' " *Thompson*, 371 Md. at 486, 810 A.2d at 443. In explaining the inappropriate nature of that language the Court explained:

> "This concept of a 'final test' implies that there is a standard of service to which a juror should aspire, one that requires a verdict to be reached rather than one that requires consideration of the individual conviction and whether individual conviction thoughtfully can be reconciled with collective judgment. Because a verdict cannot be reached without unanimity, the 'final test' language logically implies that a 'good' juror acquiesces in a verdict rather than adheres to his or her own judgment."

*Id.* As a result, a trial judge's safest course of action when using the *Allen*-type charge is to adhere to the MPJI–Cr 2:01.

As in *Thomas*, it is possible for a juror to infer from the trial judge's comment in the case at bar that the juror was obligated to put aside his or her own judgment or risk violating his or her oath and face the consequences of such a violation. The State argues that the trial judge's comment "stands in sharp contrast" to the language used in *Burnette* which was disapproved by this Court. We disagree; not only does the trial judge's statement in the case *sub judice* fall within the category of forbidden comments, it is a bright demonstration of the type of coercive statement *Burnette* warned against. In *Burnette*, the instruction stated: " '*If your views are contrary to those of the vast majority you should consider whether your views, which make no impression on the minds of so many equally intelligent jurors, are correct.*' " *Burnette*, 280 Md. at 99, 371 A.2d at 668. In response to that language we stated: "It is difficult to imagine a minority juror who would not be placed in some discomfort on hearing this instruction. Criticism runs directly to *him*, and he might understandably conclude that proper 'deference' to the opinions of the majority demands that he abandon his conscientious position." *Id.* at 100, 371 A.2d at 668. It is likewise difficult to imagine that the juror, who either had a

general distrust of police officers or a specific distrust of the officers in this case, or both, would not have been "placed in some discomfort" or consider that the comment might be suggesting that he or she should "abandon his [or her] conscientious position."

We have previously stated that "the trial judge's influence upon the jury is profound." *Hutchinson,* 287 Md. at 208, 411 A.2d at 1041. In the case *sub judice,* the trial judge first told the jury that he had received a note stating that one of them did not trust the police no matter the circumstance. He immediately thereafter stated "[a]nybody who had felt that way should have said so in voir dire so a challenge could have occurred, and if anybody deliberates with that spirit now, I suggest they might be violating their oath." As stated in *Burnette,* such criticism runs directly to the person to whom the note referred. That person, whoever he or she might be, could reasonably conclude, or feel compelled to conclude, that he should change his position and agree with the majority because of the fear of the repercussions he or she may face. The fear by a juror of adverse repercussions from the State, the defendant, or the court, should not be permitted to be a factor in deliberating a party's fate.

We have also addressed a trial judge's obligation to refrain from coercive language in a number of occasions in which the jurors had provided ambiguous answers during post-verdict polling. *Bishop,* 341 Md. 288, 670 A.2d 452; *Lattisaw,* 329 Md. 339, 619 A.2d 548. In *Lattisaw* we stated that, although the trial judge may question the jurors,

"[i]n doing so, ... the court must be careful not to influence or coerce the juror's decision during the course of the questioning. As the Supreme Court has said, ' "The influence of the trial judge on the jury is necessarily and properly of great weight," and jurors are ever watchful of the words that fall from him.' *Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946), quoting *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894). And we have warned that

'[t]he law does not permit the judge to suggest the alteration of a verdict in substance. He must not throw the weight of his influence into the deliberations of the jury as to matters exclusively within their province.' *Heinze [v. State],* 184 Md. [613,] 618, 42 A.2d 128 [(1945)]." *Lattisaw,* 329 Md. at 347, 619 A.2d at 552; *Smith,* 299 Md. at 168, 472 A.2d at 993 (stating that "[w]hile the case is still within the province of the jury, the court may permit them to reconsider and correct the verdict, *provided nothing be done amounting to coercion or tending to influence conviction or acquittal* ")(emphasis added).

Although the trial judge may not intend to coerce the suspected juror into agreeing with the majority, the judge's actions, nevertheless, potentially can have just that effect. In *Bishop,* during post-verdict polling, the third juror responded "uhh, reluctantly, yes" to the clerk's inquiry as to the juror's concurrence with the verdict. *Bishop,* 341 Md. at 289, 670 A.2d at 453. The defense attorney immediately objected. Instead of returning the jury to the jury room for further deliberations, the trial judge directed the clerk to " 'start polling the jury again and start with the first juror as you did.' " *Id.* at 290, 670 A.2d at 454. The jurors were repolled and that time the third juror responded affirmatively and without hesitation. This Court reversed the verdict stating that "[t]he course followed by the trial judge generated a significant possibility that the reluctant juror felt some compulsion to give the response that had proven acceptable as opposed to the one that was obviously unacceptable." *Id.* at 294, 670 A.2d at 455. We then concluded that "[t]he procedure employed did not resolve the ambiguity, because it is impossible to determine whether the subsequent 'yes' was a product of compulsion or represented the requisite unanimity." *Id.* at 294, 670 A.2d at 456. In the case *sub judice* it is possible that the trial judge's remarks improperly influenced the juror in question to put aside his or her views in fear of violating their oath and the unexplained consequences of such a purported violation. Furthermore, the judge's attempt to solve the problem created by the alleged juror bias makes it

impossible to determine whether the verdicts "were a product of compulsion or represented the requisite unanimity."

 In these cases we have stated that the trial judge, when faced with these type of situations, has a limited number of options at his or her disposal. In *Lattisaw,* we stated:

"To cure the ambiguity in [the juror's] verdict, the trial court may have employed either of two options. The safest course would be for the court to send the jury out for further deliberations ... with the simple instruction that their verdict must be unanimous. Alternatively, the trial court may attempt to clarify the juror's ambiguous response by questioning the juror directly."

329 Md. at 347, 619 A.2d at 552 (footnote omitted); *Bishop,* 341 Md. at 294, 670 A.2d at 455. If the judge decides to question the juror, he or she "must be careful not to influence or coerce the juror's decision during the course of the questioning." *Lattisaw,* 329 Md. at 347, 619 A.2d at 552. In cases such as the one at bar, the same options are available to the trial judge in order to prevent any improper influence upon the jury. The trial judge, in the case *sub judice,* did not inquire into the veracity of the allegations being raised against the juror in question, nor did he send the jury out with the simple unanimity instruction. He opted instead to comment on that juror's position. The comment was clearly meant to influence that one single juror and, as a result, it was inappropriate.

The present case involves a claim by the jury itself of alleged juror bias against the State. We have addressed the ability of a trial judge to ensure the fairness of a criminal trial upon allegations of bias in a number of occasions. In *Jenkins,* while dealing with improper communications between a State's witness and a juror, discovered a number of days after the verdict was entered, we stated:

"[O]ne of the ways to protect a defendant's constitutional right to an impartial jury is to expose the existence of factors which could cause a juror to be biased or prejudiced through the process of *voir dire* examination. If an error

dealing with witness misconduct or juror communication with third parties is discovered before or during trial, questioning the involved juror, or jurors, on the effect the error or conduct has on their ability in the future to assess the evidence impartially may be a way in which the State could rebut the presumption of prejudice to the criminal defendant."

375 Md. at 331, 825 A.2d at 1035–36 (citation omitted). This is true not only when the alleged bias is in favor of the State; it also applies when bias is in favor of the accused. The trial judge, however, is not required to conduct voir dire every time there is an allegation that the jury is prejudiced. In *Bruce v. State*, 351 Md. 387, 718 A.2d 1125 (1998), we held that the trial judge in that case did not abuse his discretion when he refused to question the jury about the posting of the defendant's two other pending cases in the electronic bulletin board at the courthouse. We explained that the judge was in the best position to determine whether the information to which the jurors were exposed was prejudicial. In the case *sub judice*, we agree with the trial judge's assessment that the note "may just be an exhausted and frustrated reaction." As a result, his decision to allow the jury to continue deliberations may have been proper had he refrained from admonishing the juror.

We look to a very old Illinois case which is instructive in this regard. In *Lively v. Sexton*, 35 Ill.App. 417 (1890),[4] albeit a civil case, upon being told that the jury stood eleven to one the judge gave the following instruction:

> "The Court: 'Gentlemen, you will retire and further consider this case, and I will say if there is a mistrial in this case I shall inquire into it, and if I find that any juror has stubbornly refused to do his duty or wilfully tried to bring about a disagreement so as to interfere with the administration of justice, I will send him to jail for contempt of court.'"

---

4. We cited *Lively* in *Leupen*, 248 Md. at 26, 234 A.2d at 576, as an example of unacceptable coercive instructions. In *Leupen*, we adopted the original *Allen*-charge, which as explained *supra* has evolved to the current MPJI–Cr 2:01.

*Id.* at 419. The intermediate appellate court of Illinois, in reviewing the trial judge's actions stated:

"Whatever rigid analysis we may make out of this remark of the court, we think it meant to the one juror that the judge regarded him as an obstructionist, stubbornly refusing to do his duty, and that if he did not surrender his opinion by agreeing with the eleven, his liberty was in danger. The verdict may be reasonably accounted for in that way.

"If the weight of the evidence on the question of probable cause was in the plaintiff's favor, the preponderance was not so plain that the most intelligent man on the jury might not have fairly and honestly maintained the innocence of the defendant. The record does not present a case where a palpable invasion of the province of the jury may be excused for the reason that it is manifest no injury ensued therefrom. If, instead of the objectionable remark, the court had read to the jury an instruction assuming there was no probable cause the error would be admitted to be fatal. To our apprehension the remark was far more objectionable, and by many degrees more certain to bring the one juror to concurrence with the eleven.

"The authority of the judge does not extend to the coercion of a single juror. By the well defined limit of his powers he is denied all discretion in that respect. It is apparent that if he may, by threats, influence one juror, the largest minority may be treated likewise. If this practice is tolerated, the uniformity of trial by jury disappears, as judges would have different views as to the size of the minority whose opinion should be respected. A reform of the jury system in this respect, if it comes at all, must be from a different source. The law recognizes only the unanimous verdict, and no other can be, directly or indirectly, introduced by the judiciary."

*Id.* (internal citation omitted). The trial judge's comment in the case *sub judice* generated a similar coercive effect. It can equally be said of the judge's statement in this case, although,

in a more concise form, that the effect may have been the same as in *Lively*:

> "Whatever rigid analysis we may make out of this remark of the court, we think it meant to the one juror that the judge regarded him as an obstructionist, stubbornly refusing to do his duty, and that if he did not surrender his opinion by agreeing with the eleven, his liberty was in danger. The verdict may be reasonably accounted for in that way."

Although it could be argued that the trial judge did not *per se* threaten the hold-out juror with perjury, that was a strongly implied message from the express assertion that such attitude may violate his or her oath.

The right to a fair trial guaranteed by the Sixth Amendment of the United States Constitution and Article 21 of Maryland's Declaration of rights requires that judges refrain from making comments which potentially may improperly influence the jury or a specific juror or jurors. The judge's comment, made during jury deliberations in the case *sub judice*, was potentially coercive and, as a result, petitioners may have been denied their constitutional right to a fair trial. Consequently, we reverse the judgment of the Court of Special Appeals with instructions to remand the case to the Circuit Court for Baltimore City for a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE CITY.**