JOHN RAY SMOOT, JR. *v.* STATE
OF MARYLAND

[No. 599, September Term, 1975.]

*Decided April 12, 1976.*

The cause was argued before ORTH, C. J., and THOMPSON, GILBERT and MOORE, JJ.

*Thomas F. Hogan* for appellant.

*Henry E. Dugan, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County* and

Ronald G. Scheraga, Assistant State's Attorney for Montgomery County on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

As in *Pinder v. State*, decided this date,[1] we are here confronted with a contention that a guilty verdict was coerced. For reasons different from those found and explained in *Pinder*, we sustain appellant's contention. The judgment of conviction of larceny upon which appellant was sentenced to a term of six years (execution of which was suspended and supervised probation for six years imposed) will be reversed and a new trial ordered.

I

Appellant was employed as a maintenance worker at the Blair Plaza Apartments in Silver Spring, Montgomery County, Maryland in October, 1974. The occupant of Apartment 907, Annie Drew Derrick, age 84, reported to the management and to the police on October 9, 1974 the theft of two rings — her own three-diamond ring with a Tiffany setting, and a gold ring of her daughter, twenty years deceased. (The value of her own ring was established at approximately $1,000 but the testimony did not develop a value for her daughter's ring.) These two rings had been kept by her in a box on the top of her "chiffonier" in her bedroom together with a third ring — a bloodstone — which had not been touched.

On Wednesday, October 8, 1974, appellant was dispatched to Mrs. Derrick's apartment to repair a thermostat. According to her testimony, while appellant was in the process of examining the thermostat in her bedroom, he inquired if she had a small screwdriver. She withdrew from the bedroom for several minutes and returned with the

---

1. Case No. 735 and No. 1128, September Term, 1975, consolidated for oral argument. In *Pinder* we reversed convictions for rape and burglary because the trial court failed to adhere to the requirements of an "*Allen*-type" charge explicated by the Court of Appeals in Kelly v. State, *infra.*

screwdriver requested by him. The next day, she discovered the loss of the two rings. Asked to describe how she discovered that the rings were missing, she responded:

> "A Well, I go to church on the second Wednesday in the month, and I didn't notice my ring until I opened the box to put my rings on, and the first I noticed was my daughter's ring gone. I never touch that ring. And then mine. But my bloodstone ring was left in the box. This one I have on.
>
> "Q Is it your habit to wear that diamond ring when you go to church?
>
> "A Yes. I wear them whenever I go out.
>
> "Q And where are those rings kept?
>
> "A Right on the chiffonier."

Other testimony of the elderly widow revealed that she lived alone, went grocery shopping about once each week, on Friday, did not "hear too well," was on prescribed medicines, including sleeping pills, and that a key to her apartment was also in the possession of the front office.

The State's case against the appellant under an indictment charging him with larceny of the value of $100 or more and of larceny under the value of $100 was presented through the testimony of Annie Drew Derrick and of Dorothy L. Murphy, resident manager of the Blair Plaza Apartments. The latter confirmed the employment of appellant in maintenance and general repair work during the period September 27 through October 11, 1974. During her testimony, a repair order for the thermostat in the living room and master bedroom of Apartment 907 on October 8, 1974 was introduced. Appellant's initials appeared in the right-hand corner and signified his performance of the work. No other witnesses testified for the State and appellant did not take the stand in his own behalf.

The trial commenced at approximately 10:00 a.m. and the jury retired at approximately 3:15 p.m., after a luncheon recess, oral argument and instructions by the trial court. At

4:35 p.m. the jury sent a note to the trial judge (Fairbanks, J.), requesting pencils and paper and inquiring, "May we have a copy of Mrs. Derrick's testimony?" Upon receipt of this communication the transcript discloses that the court summoned the State's Attorney and defense counsel and read it to them. With the concurrence of both sides, the court sent a note back to the jury that Mrs. Derrick's testimony would not be transcribed.[2]

A second note was received from the jury at 5:23 p.m., reading as follows:

> "The jurors at present have firm judgments on the defendant's guilt or lack of it.
>> 8 consider him guilty
>> 4 not guilty
> & all have stated that they are adamant in their beliefs."

Without disclosing the contents of the second communication to either side, the trial court reassembled the jurors in the jury box. It appears that the State's Attorney, the defendant (appellant) and defense counsel were present in the courtroom. In response to the second note the court made the following remarks:

> "THE COURT: Now, ladies and gentlemen of the jury, I am advised that you are having some difficulty in coming to a verdict. The note which you have just sent out would at first blush lend one to believe that you can't come to a verdict.
>
> "*Well, I will not accept that.* You have only been deliberating for about two hours, approximately two hours. I am sure that if you continue your deliberations, you will be able to reconcile your various views, and come to a verdict. *I propose to require you to go back and do some more deliberating.* I don't consider that a two-hour deliberation on a matter of this kind as any

---

2. It does not appear that court or counsel considered the reading of Mrs. Derrick's testimony in lieu of its transcription.

indication that you are, or ultimately will remain deadlocked, so you ladies and gentlemen will return to the jury room and continue your deliberations." (Emphasis added.)

After the jury returned to the jury room, the court then addressed itself to counsel, stating:

"Now, what this is all about is that they came out with a note in which they say that they are divided in a particular way, and that they think they are hopelessly deadlocked. My experience with juries is that they don't deadlock in two hours, and I just don't accept that, and if necessary, and I will tell you this — I won't tell it in front of them — *I'm going to keep them here all night, if I have to.*

"MR. HOGAN [Defense Counsel] May I be heard, Your Honor?

"THE COURT: Yes, you may.

"MR. HOGAN: Your Honor, for the record, I object to the instruction the Court just gave the jury.

"THE COURT: What instruction is that?

"MR. HOGAN: That they had to go back and find a decision.

"THE COURT: I said go back and continue their deliberations.

"MR. HOGAN: Perhaps I took it a little stronger than Your Honor did, but I felt that you ordered them to make a decision in the case.

"THE COURT: I didn't do anything. I simply told them, Mr. Hogan, that I thought two hours was not a sufficient time, and that if they continued to work, they could reconcile their differences, and to go back and continue their deliberations.

If necessary, I'll have the reporter read it back.

"MR. HOGAN: *Well, my motion is for a mistrial at this time because of that instruction. I believe it has a coercive effect upon them.*

"THE COURT: *Well, you wait. If they are out there long enough, I'm going to give them the Allen Charge. Then maybe you will have something to complain about.*

"MR. HOGAN: The *Allen* Charge is generally acceptable, but I don't think Your Honor's instruction — Your Honor's instruction at this point was stronger than the *Allen* Charge.

"THE COURT: I told them to continue their deliberations. Now, I didn't tell them to continue to a verdict one way or the other. I told them that I thought they could reconcile their differences. There is nothing the matter with that. They might reconcile their differences in a not guilty verdict. Did that occur to you?

"MR. HOGAN: Also, Your Honor, I think from the tone of the instruction it could have a coercive effect upon them.

"THE COURT: Well, sir, if they come out with a guilty verdict, you may take an appeal on that basis. I recognize your motion, and I deny it." (Emphasis added.)

In the continuing colloquy between court and counsel for appellant, the latter observed that the jury had "apparently" indicated to the court a numerical division although counsel had not seen the note. Defense counsel pursued this point, stating:

"MR. HOGAN: I believe, Your Honor, that that is grounds for a mistrial, because they are not supposed to indicate numerically that they are split at all."

The following thereafter ensued:

"THE COURT: I didn't ask for it. It's in their note.

"MR. HOGAN: I think that's unfortunate.

"THE COURT: Well, you get me some authority

on that. I don't know of any authority that says that.

"MR. HOGAN: I think if they reveal what their division process is before they reach a decision, it tends to influence a further deliberation in the case in the way that we answer in the note, and the way we ask them to go back and decide again, or not.

I would think, Your Honor, I would be a little bit better able to argue this if I could see the note.

"THE COURT: Sure. Hand him the note.

"MR. HOGAN: Thank you, Your Honor.

"THE COURT: Now, what's your authority for the fact that they have disclosed their numerical decision, that that calls for a mistrial?

"MR. HOGAN: I don't have that in front of me. I'll have to supply that at a later time, but I believe that there have been decisions that if the jury has revealed how it's standing, and what its feelings are, that either then it's clear there should be a mistrial, or there's just —

\* \* \*

"THE COURT: Maybe that's more preferable to the defendant, but I don't know of any law that says that that requires a mistrial.

Do you know of any, Mr. Scheraga?

"MR. SCHERAGA [Assistant State's Attorney]: No, Your Honor, and I think the Court's direction to them was neutral.

"THE COURT: Well, I intended it to be. I don't know whether it sounded that way or not, but I intended it to be."

The court recessed at 5:30 p.m. The jury suspended deliberations for dinner from 6:30 p.m. until 8:15 p.m. A third communication was sent to the trial judge at 9:20 p.m.:

"The jury feels that based on the evidence we have,

we can not come to a unanimous decision. We are still at a deadlock on the same 8 to 4 combination — 8 for the verdict of guilty & 4 for the verdict of not guilty.

"What do we do now?"

The trial judge summoned the attorneys and stated that "I do not propose to discharge them, and I simply wish to send back the message, without taking the time to bring them in here, and tell them to stay at it."

With respect to the time and circumstances, the court also then observed:

"Now, they haven't been deliberating hardly an hour since they went to eat. They had a good, long, pleasant dinner hour, which lasted from six-thirty until a quarter past eight, and they should have gotten nice and thoroughly relaxed over that. Now, they came back, and they have been going only another hour. When that note came in to me it was about ten minutes past nine."

Thereupon counsel for appellant renewed his motion for a mistrial, contending:

"In addition to the other two bases I believe we have a hung jury. They have indicated through two notes they are hung, irreparably hung, and I think at this time, in considering the trial was only a few hours, they have been deliberating longer than the trial was at this point. In fairness, we should have a hung jury and a mistrial."

With the concurrence of defense counsel who preserved for the record, however, his motion for a mistrial, the court instructed the bailiff to inform the jury that they were to continue their deliberations.

The transcript discloses that the court thereafter reconvened at approximately 10:30 p.m., at which time the

trial judge spread on the record the sequence of events since the jury first retired to deliberate and then stated:

"Now, I propose to call them in in a moment and read them the charge recommended in the American Bar Association standards relating to trial by jury Section 5.4. This instruction has been approved by the Court of Appeals."

The State offered no comment. Defense counsel, however, interposed an objection to the court's instruction and to the continuation of the case. He argued:

"It seems to me in five hours and twenty-five minutes of actual deliberation time, with two notes, both commenting they are completely and irrevocably separated, and with a trial that lasted approximately three hours, that balancing those factors out we must come to the conclusion that further deliberation would be fruitless, and that to send them back again is an attempt to coercing a verdict from them, which I do not believe is fair to the defendant.

"THE COURT: Very well. Bring in the jury.

"MR. HOGAN: Your Honor, I would again move for a mistrial as a result of that.

"THE COURT: Denied."

At the conclusion of this exchange between court and counsel, the jury returned to the courtroom and the trial judge *sua sponte* delivered the following supplemental instruction:

"THE COURT: Now, ladies and gentlemen of the jury, I propose to give you a further instruction. I am authorized to do this by the law of Maryland, and by certain standards which have been proposed by the American Bar Association in its standards relating to trial by jury, and I will now do so.

"Ladies and gentlemen, it is your duty as jurors to consult with one another and to deliberate with a

view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or the effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans, you are judges, and since this is a criminal case you are judges both of the law and the facts. Your sole interest is to ascertain the truth from the evidence in this case.

"Ladies and gentlemen of the jury, retire to the jury room." [3]

The court recessed at 10:40 p.m. and reconvened some forty minutes later at approximately 11:30 p.m., presumably having been advised by the bailiff that the jury had reached a verdict. Upon inquiry from the clerk, the forelady announced that the jury had found appellant guilty under count one of the indictment. A presentence investigation was ordered and the court adjourned at approximately 11:35 p.m.

On this appeal, appellant mounts a four-pronged attack upon the trial proceedings: He argues that: (1) it was unreasonable and coercive to require the jury to spend "$6^1/_2$ hours in actual deliberation to reach a verdict after a 3-hour trial;" (2) the first *Allen*-type instruction given more than 2 hours after the jury had begun deliberation constituted reversible error because it deviated from the language

**3.** The charge adhered to that approved in Kelly v. State, 270 Md. 139, 310 A. 2d 538 (1973). However, the following sentences from the model were significantly absent:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree threeto. Your verdict must be unanimous."

approved in Maryland for use in such circumstances; (3) the court erred in twice refusing to grant defendant's motion for a mistrial after learning of the jury's 8 to 4 division in favor of a verdict of guilty; and (4) it was an abuse of discretion to give the second *Allen*-type charge of 10:30 p.m.

Because of the interrelation of the several assignments of error, we have quoted extensively from the transcript and proceed to examine the period of deliberations as a whole.

## II

In his first supplemental remarks to the jury, heretofore quoted in full, the trial court dismissed the suggestion that the jury could not reach a verdict. His statement to them after some two hours of deliberation included the following:

> "*Well, I will not accept that* . . . I propose to *require* you to go back and do some more deliberating. I don't consider that a two hour deliberation on a matter of this kind is any indication that you are or ultimately will remain deadlocked." (Emphasis added.)

Unquestionably, these remarks constituted an instruction within the scope of Maryland Rule 756 g. *Taylor v. State,* 17 Md. App. 41, 299 A. 2d 841 (1973). Furthermore, it was indubitably coercive. *Jenkins v. United States,* 380 U. S. 445 (1965), reversing 330 F. 2d 220 (D.C. Cir. 1964); *Plumley v. State,* 4 Md. App. 671, 245 A. 2d 111 (1968); *State v. Rodman,* 23 So. 2d 204 (La. 1945).

In *Jenkins, supra,* the dissenting opinion at the Court of Appeals level [4] discloses that the jury sent the trial court a note after two hours of deliberation, reading:

> "The jury cannot come to a decision on both counts because of insufficient evidence."

---

4. The panel was composed of Judges Wilbur K. Miller, Warren E. Burger (now Chief Justice) and J. Skelly Wright. Judge Wright dissented.

The court (Holtzoff, J.) thereupon gave the jury additional instructions, including:

> "*Now I am not going to accept this.* You have got to reach a decision in this case." (Emphasis added.)

After further deliberation the jury brought in a verdict of guilty of robbery. The majority of the Court of Appeals rejected appellant's contention that the trial judge had given a coercive instruction. The United States Supreme Court granted certiorari, 379 U. S. 944 (1964), to determine if "the statement was coercive." Thereafter, in a *per curiam* opinion, the court noted that the Solicitor General stated in his brief:

> "Of course, if this Court should conclude that the judge's statement had the coercive effect attributed to it, the judgment should be reversed and the cause remanded for a new trial; the principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." 380 U. S. at 446.

The Court concluded that the statement did have a coercive effect and reversed the conviction.

And in *Plumley, supra,* Judge Morton, speaking for this Court, stated that "such language as the jury has 'got to reach a verdict' and 'this Court expects a verdict' has been held to savor of coercion or undue pressure." Similarly, in *Rodman, supra,* where the jury informed the trial judge that "we cannot agree and wish to report a mistrial" and the court upon receiving the statement said,

> "The court will not accept a mistrial and you must deliberate further,"

the Supreme Court of Louisiana found reversible error. The Court ruled:

> "We are of the opinion that, when the jury came into court, stated that they could not agree, and wished to report a mistrial, *the statement of the trial judge to the effect that the court would not*

*accept a mistrial and that they must deliberate further was, in effect, coercing a verdict* either of guilty as charged in the information or of any lesser offense contained therein, or of not guilty, *and this statement, in our opinion, deprived the accused of the right to a mistrial in the event the jury could not agree.* " 23 So. 2d at 205. (Emphasis added.)

There is a striking parallel between the language found coercive in the above authorities and that employed below — "Well, I will not accept that" and the court's statement that he would "require you to go back and do more deliberating." These statements of the court constituted an *Allen*-type charge subject to "careful scrutiny" under *Kelly v. State,* 270 Md. 139, 310 A. 2d 538 (1973). On the basis of such scrutiny, we find coercion and therefore reversible error.[5]

Additional evidence of coercion may also be found, in our judgment, in the trial court's candid statement to defense counsel that "I am going to keep them here all night, if I have to." While this statement was not made to the jury and, indeed, the trial judge remarked, "I won't tell it in front of them," it nevertheless reflects an attitude on the part of the presiding judge, under the totality of circumstances in this case, that the possibility of a mistrial would not be tolerated.[6]

A regrettable aspect of the proceedings below, we also believe, was the unfortunate disclosure by the jury not only of their numerical division but also the number voting for conviction and for acquittal. Had this information been solicited by the trial court — and not volunteered by the jury — such action would have constituted reversible error. *Brasfield v. United States,* 272 U. S. 448 (1926); *Taylor v. State, supra.* In *Brasfield,* the jury had failed to agree after some hours of deliberation. The trial judge inquired how it

---

5. Clearly, the subsequent *Allen*-type charge made substantially in accordance with the ABA Standards as set forth in *Kelly* was no cure for the earlier, coercive charge.

6. *See,* Taylor v. State, 17 Md. App. 41, 50, *supra,* at n.10, where Judge Carter pointed out, *inter alia,* that there is a conflict in the decisions as to whether it is error for the trial judge to keep the jury confined for a specified period of time unless an agreement is sooner reached.

was divided numerically, and the foreman replied that it stood 9 to 3, without indicating which number favored a conviction. Reversing the judgment, the Supreme Court held, at 450:

> *"We deem it essential to the fair and impartial conduct of the trial, that the inquiry should be regarded as ground for reversal.* Such procedure serves no useful purpose that cannot be attained by questions not requiring the jury to reveal the nature or extent of its division. *Its effect upon a divided jury will often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts and may vary widely in different situations, but in general its tendency is coercive.* It can rarely be resorted to without bringing to bear in some degree, serious although not measurable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded. Such a practice, which is never useful and is generally harmful, is not to be sanctioned." (Emphasis added.) [7]

Here, the jury twice volunteered the details of their division. After the first disclosure, they should have been admonished by the court, and counselled against any repetition. In the absence of such a cautionary instruction, the second disclosure of their split, at 9:20 p.m., was even more explicit and more improper. It recited "a deadlock on the *same* 8 to 4 combination." (Emphasis added.)

In response to the plaintive inquiry on the "bottom line" of their note, "What do we do now?", the trial court, under the circumstances then existing in this case, should have granted the appellant's motion for a mistrial and sent them home. To require, as he did, another hour of deliberation and

**7.** For recent applications of the rule in Brasfield, *see* United States v. Hayes, 446 F. 2d 309 (5th Cir. 1971); United States v. Cheramie, 520 F. 2d 325, 331 (5th Cir. 1975). *See, also,* United States v. Diggs, 522 F. 2d 1310, 1322 (D.C. Cir. 1975).

then *sua sponte* to administer the *Allen*-type charge—even though substantially in the form recommended by the ABA Standards — was an abuse of discretion under *Kelly* and *Leupen v. Lackey*, 248 Md. 19, 234 A. 2d 573 (1967).

A comment also appears appropriate with respect to the trial court's handling of the first communication from the jury, after two hours of deliberation, disclosing their apparent stalemate. The jury, as we have stated, was assembled in the jury box and instructed by the court. Only after the conclusion of such instruction were counsel — and the accused — given any explanation for this procedure. As a general proposition, communications from the jury should be immediately disclosed to both sides unless, of course, they relate to mere physical requirements. *See, Winegan v. State,* 10 Md. App. 196, 268 A. 2d 585 (1970). Indeed, in a criminal case, the receipt of a communication from the jury may constitute a phase of the trial, *State v. Saul,* 258 Md. 100, 265 A. 2d 178 (1970), and care should be exercised that the communication be revealed not only to counsel but also to the accused. We observe also that questions of some perplexity will arise when the jury transmits, as here, an *improper* communication in a criminal case. In such a situation it may be appropriate, with the concurrence of counsel, to seal the communication, without its disclosure, pending receipt of the verdict; and in such eventuality additional care should be observed before an *Allen*-type charge is given.

While it is not essential to consider appellant's remaining contention — that coercion is inherent when a jury is required to deliberate 6 hours after a 3 hour trial — we have found no support for such a proposition and, indeed, consider it at variance with the authorities cited in the commentary to § 5.4 of the ABA Standards. The determining factor is the conditions under which the jury is required to deliberate, not the total length of time.

> *Judgment reversed; case remanded for a new trial; costs to be paid by Montgomery County.*