Delonte C. FORTUNE, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CF–780.

District of Columbia Court of Appeals.

Argued May 10, 2012.

Decided May 2, 2013.

---

Christine A. Monta, Public Defender Service, with whom James Klein, Samia Fam, and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Kevin Flynn and Seth Waxman, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and OBERLY, Associate Judges, and PRYOR, Senior Judge.

GLICKMAN, Associate Judge:

Following a short trial in appellant's first-degree murder prosecution the jury thrice reported itself deadlocked—stymied, it said in its second note to the court, by "a fundamental disagreement." The third note, sent after more than eight hours of deliberation, informed the court that the jury was evenly split; that the jurors in each camp had "absolutely no doubt about their vote" on the question of appellant's "guilt or innocence"; that despite "several attempts to consider the evidence objectively," the jurors had "not been able to overcome this impasse"; and that "all 12 jurors" agreed they would be unable to come to a unanimous verdict "based on the evidence" they had heard. In response to this report, and over appellant's objection, the judge told the jurors he did not agree with them and that it was his "job to make that kind of decision." With that, the judge sent the jurors back for further deliberations, telling them not to reveal how they were voting "until after [they] had] reached [a] unanimous verdict." Appellant objected that the judge's remarks had been unduly coercive. When the jurors resumed deliberations, it took them only 93 minutes to notify the court they had a verdict—one acquitting appellant of first-degree murder but finding him guilty of the lesser-included offense of second-degree murder.

After polling the jury and ascertaining from the jurors' on-the-record responses that their verdict was unanimous, the judge decided in light of appellant's objections to ask whether any jurors felt he had coerced them into reaching a verdict. Two of the jurors answered this question in the affirmative. In response to follow-up questioning by the judge, these jurors confirmed that they felt he had forced them to produce a unanimous verdict. Based on their statements, the judge granted appellant a mistrial. However, on the government's motion for reconsideration, the judge reversed himself and reinstated the jury's verdict.

"[T]he principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration."[1] Claiming that such coer-

---

1. *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) (quoting

cion is manifest on the record before us, appellant argues that he is entitled to a new trial. The parties disagree about what evidence of coercion we may consider in evaluating appellant's claim—specifically, whether it is proper to rely on the jurors' post-verdict statements that they actually felt coerced. We agree with the government (as did the trial judge himself, upon reflection) that those statements must be disregarded because they purported to reveal the effect of the judge's instruction on the jurors' votes and their thought processes concerning the verdict.

Appellant argues that, even ignoring what the jurors said, we should recognize that the judge's response to the third jury note was impermissibly coercive, amounting to a clear message that "he believed that the case was capable of resolution and thus that [the jurors] had to come up with a unanimous verdict and would be deliberating indefinitely until they did so."[2] The government disagrees, arguing that "there was 'no hint of coercion'" in the judge's instruction, which "equated to nothing more than a direction to continue deliberating."[3]

We conclude, without relying on the post-verdict statements of the jurors, that the judge's response to the third jury note was indeed impermissibly coercive and that appellant therefore must be granted a new trial.

## I.

Appellant was indicted for first-degree premeditated murder while armed, possessing a firearm during a crime of violence, and carrying a pistol without a license. The charges related to the shooting of Lamont Watkins sometime after midnight on August 7, 2005. Trial commenced on February 19, 2009. The presentation of evidence lasted just two and a half days and was not complicated. The government presented no physical evidence linking appellant to the shooting; its case turned on the disputed credibility of the prosecution witnesses—especially that of the only professed eyewitness to the shooting, James Morrison.

Morrison testified that he was on his porch, smoking marijuana, when he saw appellant (whom he knew from the neighborhood by his nickname "Mayo") shoot Watkins in a nearby alley. Morrison nonetheless did not call the police or summon help for Watkins, nor did he speak to the police when they arrived to investigate. Afterward, Morrison was the source of an anonymous telephone tip to police that "Mayo" was the shooter, but he did not come forward until, some two years later, he contacted the police again, identified himself, and told them he had seen appellant commit the homicide. The defense theory at trial was that Morrison did not witness the shooting, and indeed could not have done so from his vantage point on the porch of his home, but believed that appellant was the perpetrator based on the rumors he had heard in the neighborhood.

A second witness, Bronson Covington, testified that he saw appellant and Watkins enter the alley, heard gunshots, and then saw appellant run away.[4] But Cov-

---

the brief of the Solicitor General) (quotation marks omitted) (holding that a trial judge's statement, in response to a jury note declaring its inability to agree on a verdict, that "[y]ou have got to reach a decision in this case," was coercive).

2. Brief for Appellant at 21.

3. Brief for Appellee at 42–43 (quoting *Van Dyke v. United States*, 27 A.3d 1114, 1124 (D.C.2011)).

4. However, while Morrison testified that appellant ran out of the alley onto 9th Street, Covington said he ran down Randolph Street

ington's credibility too was subject to challenge. He did not call the police or seek help for Watkins, and he initially told investigators he knew nothing about the shooting. Only in January 2009, after detectives told him they believed he knew something about the shooting and "could be in some legal trouble" if he did not help them, did Covington say he was a witness.[5]

The case was submitted to the jury on February 25, 2009. Regarding the lead count, the jury was instructed to consider the lesser-included offense of second-degree murder while armed in the event it found appellant not guilty of first-degree murder while armed. The following morning, after one of the jurors had to be excused and was replaced by an alternate, the judge instructed the jury to begin its deliberations anew.[6]

At 4:28 that afternoon, the jury, having deliberated approximately four hours, sent a note stating it was unable to reach a unanimous verdict. The judge told the parties' counsel he doubted there was any "appropriate response other than to tell [the jury] I received it."[7] Both counsel agreed that it was too early for an anti-deadlock instruction. The judge brought the jurors into the courtroom and, regarding the note, addressed them as follows:

> I read the note to the lawyers and it says, "[w]e the jury cannot reach a

unanimous verdict." And one of the attorneys said, well, Judge, what are you going to say to—you going to say anything to the jury[?] Yeah, I'm going to tell them I got your note.

Saying nothing more on the subject, the judge dismissed the jury for the weekend.

The jurors resumed their deliberations at 10:00 a.m. on Monday. Two and a half hours later, they sent a second note. This note stated: "[W]e cannot come to [a] unanimous decision based on a fundamental disagreement." Defense counsel asked the judge to give the jury a "Gallagher" anti-deadlock instruction,[8] arguing that, though the jury had not been deliberating "at great length," it had been a brief trial, and it now appeared the jurors were at "a significant impasse." The judge denied this request and chose instead simply to tell the jurors in a written reply to their note to continue their deliberations.

At 3:40 p.m., by which time the jury had been deliberating for roughly eight and a half hours, the jury sent a third note. It read:

> Judge Rankin, there are an equal number of jurors evenly split [in] opinion who have stated that they have absolutely no doubt about their vote of guilt or innocence. After several attempts to

---

and was sure that no one ran from the alley onto 9th Street.

**5.** A third government witness, Monika Beene, testified that she saw appellant and Watkins fighting several hours before the shooting. Later, Beene said, she was in her room when she heard the shots, looked out her window, and saw a man running down Randolph Street. Beene could not identify the man but said he was dressed like appellant. The defense called two witnesses to impeach Beene: her friend Erica Wright, who contradicted Beene's claim to have seen appellant and Watkins fighting, and a defense investigator, who testified that Beene had denied having

observed anyone running from the scene of the shooting.

**6.** *See* Super. Ct.Crim. R. 24(c)(3).

**7.** The judge expressed surprise that the jury sent such a note so soon after commencing deliberations.

**8.** *See* Criminal Jury Instructions for the District of Columbia, No. 2.601(III)(C) (5th ed. Rev.2009) (hereinafter, "Criminal Jury Instructions"); *Winters v. United States*, 317 A.2d 530, 539 (D.C.1974) (en banc) (Gallagher, J., concurring).

consider the evidence objectively, we have not been able to overcome this impasse. At this time, all 12 jurors are in agreement in the belief that we will not be able to come to [a] unanimous verdict, based on the evidence presented in this case. Respectfully, the jury.

Now the government asked the judge to read the jury an anti-deadlock instruction.[9] Defense counsel moved for a mistrial, arguing that asking the jury to continue further deliberations at this point would be coercive. The judge declined to follow either suggested course of action, explaining that he considered it "fair for this jury to spend time and wrestle with this evidence and the issues presented" in this "serious case" and that, in his view, an anti-deadlock instruction would be "premature."

The judge proceeded to address the jury in open court by reading the third note aloud to it and then saying, "I hate to make myself the odd person out, but I don't agree with the jury, and it's my job to make that kind of a decision." With that, the judge instructed the jurors to return to the jury room for further deliberations at 10:00 the next morning and not "under any circumstances" to reveal "how jurors are voting until after you have reached [a] unanimous verdict."

After excusing the jury for the day, the judge afforded the parties an opportunity to object to what he had said. The prosecutor declared that the government had no objection and, in fact, agreed with the judge's decision not to give an anti-deadlock instruction at this juncture. Defense counsel renewed his request for a mistrial or, "at the least," an anti-deadlock instruction. He argued that merely telling the jurors to continue deliberating in these circumstances was coercive because it was calculated to make them feel "they have to reach some kind of verdict" even if it would be contrary to their convictions "in order to get out of this situation."[10] Unpersuaded by the defense argument, the judge responded that, in his judgment, the jury had "yet to put in the time that would allow them to say ... or me to conclude that they are hopelessly deadlock[ed]."

The following morning, the jury reconvened at 10:20, and at 11:53 it notified the court that it had reached a unanimous verdict. Before the verdict was taken, defense counsel renewed his motion for a mistrial. Counsel focused on the judge's statement to the jury the preceding afternoon disagreeing with the jury's expressed belief that it was at an impasse and would be unable to come to a unanimous verdict. The judge's statement, counsel argued, "was a very coercive response, however it was intended," because "it could easily be construed as saying you're not allowed to

---

9. The government requested the *Winters* instruction. *See* Criminal Jury Instructions No. 2.601(III)(B); *Winters*, 317 A.2d at 534.

10. Defense counsel explained:
[W]hen a note is this clear, that [the jurors] ... have very carefully considered it, hopefully listened to each other, and, in essence, solidified their positions, I think that to ask them to continue to deliberate is, in essence, to make them feel like ... they have to reach some kind of verdict, even if it means going against what clearly is a position that they have reached after some discussion.

.... I think to ask ... [the juror] who says ... we've looked at it essentially from all different ways, we've talked about it, we are essentially firmly fixed in our opinions at this point and agree that further deliberations will not reach the goal we all would seek in a trial, that to, then, simply ask them to continue deliberating is coercive in the sense of telling them, well, you're going [to] have to, in essence, change what you believe is a firmly fixed opinion in order to get out of this situation.

disagree, you have to come to some kind of a verdict .... and, therefore, you need to go back until you can agree." "[I]n that sense," counsel said, "the Court's words were more coercive than even a *Winters* or Gallagher instruction that says, you know, try to keep an open mind, listen to others but without sacrificing your own position."

The judge denied the renewed mistrial motion and brought the jury in to the courtroom to take its verdict. The foreperson announced that the jury had found appellant not guilty of first-degree murder while armed but guilty of second-degree murder while armed and of the two weapons counts. The judge polled the jurors individually. After each juror stated that he or she agreed with the announced verdicts, the judge declared them to be unanimous and asked counsel to come to the bench before he excused the jury.

At the bench, the judge proposed submitting an interrogatory to each of the jurors before they were released, inquiring whether "they felt that the Court pressured them in reaching a verdict." Defense counsel affirmatively requested such an interrogatory. The government opposed it, arguing that the judge had said nothing coercive, that questioning the jurors was unnecessary and "could open up a hornet's nest," and that "if any one of these jurors says yes, then at that point we're ... left bereft of options other than mistrial."

The judge responded that he did not feel his instruction had been coercive and that he "would much rather deal with this matter here and now rather than have the Court of Appeals on a cold appellate record after a year and a half" trying to determine the issue. Accordingly, after conferring with counsel about the procedure to follow, the judge distributed index cards and pencils to the jurors and instructed them to write their individual yes-or-no answers to the question, "[d]o you feel that the judge coerced you into reaching a verdict?"

Ten of the jurors answered "no" to that question—but two jurors answered "yes." The judge then undertook to voir dire the latter two jurors individually to determine "whether they believe[d] they were forced to reach a verdict" or merely "forced to continue deliberating." Both jurors stated they believed the judge had demanded they reach a verdict.

Juror 893, the foreperson, said she understood the judge's words to mean he "felt that we could come up with a verdict" and that the jury "had to go back and deliberate again" because "we needed to come up with another verdict." Asked specifically by the judge "[w]hether you believe that whatever the Court said and however the Court said it is what led to this verdict or is it what led to further deliberations," the foreperson responded, "[w]hat led to this verdict, what led to the verdict for me, it's for me, for me, what led to the verdict."

Juror 533, the second juror who answered "yes," similarly felt "coerced" by the judge's instruction to return a unanimous verdict. "I just feel," the juror explained, "that ... you demanded us to come up with an answer.... I was coerced to `continue, ... to come up with an answer.... [Y]ou wanted us to come up with [a] unanimous decision, right?" The judge asked the juror "whether it is your belief that, because I directed you to continue deliberating, that you fel[t] that you were forced to reach a verdict." "Yes," the juror answered.

After hearing the two jurors' responses, the judge excused the jury and granted the defense motion for a mistrial.

Two weeks later, the government moved for reconsideration of that ruling. It ar-

gued that the judge, by basing his decision on the jurors' answers to his interrogatory and voir dire inquiries, had violated the rule that a final jury verdict may not be impeached by statements of jurors as to matters inhering in the verdict. Appellant responded to the motion, arguing, *inter alia*, that the rule against such impeachment was inapplicable in these circumstances and that the judge had exercised his discretion properly to ascertain whether a mistrial was required. In any event, appellant argued, the record showed a substantial risk of juror coercion even without considering the jurors' answers, making a new trial necessary.

On March 30, 2009, the judge granted the government's motion, concluding that he lacked authority for his post-verdict inquiry of the jurors. "[A]fter I polled the jury and the jury affirmed its verdict," the judge stated, "it was my duty to enter the verdict."

## II.

The ultimate question we must answer in this appeal is whether the trial judge abused his discretion by responding to the jury's declaration of deadlock in a manner that was impermissibly coercive.[11] Before we can address that question, there is a preliminary issue we need to resolve first: whether we may consider the post-verdict statements by two of the jurors that they felt the judge had forced them to agree to a verdict. Although a trial judge is vested with some discretion in conducting a poll of the jury,[12] whether the post-verdict inquiry in this case was a permissible exercise of that discretion, and whether the jurors' responses are admissible to impeach their verdict, are essentially legal questions, as to which our review is *de novo*.[13]

## A.

 "It is well settled that a jury's final verdict may not be impeached by matters that inhere in the verdict."[14] The words "inhere in the verdict" have a somewhat archaic quality to them, and it may not be immediately clear to modern ears what the common law phraseology connotes. The basic principle we follow is set forth more clearly in Federal Rule of Evidence 606(b), which states:

**(1) Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

**(2) Exceptions.** A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was

---

11. *See Hankins v. United States,* 3 A.3d 356, 361 (D.C.2010) ("Whether to give an anti-deadlock instruction when a jury reports itself at an impasse, and which instruction to give, are questions committed to the trial judge's discretion. It·is, of course, an abuse of that discretion to give an anti-deadlock instruction under circumstances creating a substantial risk of juror coercion." (footnote omitted)).

12. *Jones v. United States,* 779 A.2d 357, 360–61 (D.C.2001).

13. *See United States v. Felder,* 548 A.2d 57, 61–62 (D.C.1988).

14. *Boykins v. United States,* 702 A.2d 1242, 1247 (D.C.1997) (citing *Sellars v. United States,* 401 A.2d 974, 981 (D.C.1979)).

made in entering the verdict on the verdict form.

The Rule thus draws "a dividing line between inquiry into the thought processes of the jurors on one hand, and inquiry into the existence of conditions or the occurrence of events calculated to exert an improper influence on the verdict, on the other." [15] The court may inquire, for example, into the existence of an external influence on the jury, such as adverse publicity or contacts with outside parties, but "not as to how far that influence operated on [the jurors'] mind[s]." [16] The policy reasons for "insulating the jury's deliberative process" are "weighty": Among other things, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct." [17]

■ Appellant, who urges us to consider the jurors' responses to the trial judge's post-verdict inquiry in this case, argues that the questioning did not intrude into the jury's deliberative processes. We disagree. In asking whether jurors felt the judge coerced them into reaching a verdict, whether they believed his comments led to the verdict they reached, how they understood his directive, and similar questions, the judge clearly was probing the effect of his instruction on the jurors' votes and the jurors' mental processes in arriving at their verdict. A juror may not impeach a verdict by claiming that an instruction was coercive or misunderstood.[18]

■ Appellant further argues that the judge's inquiry into coercion was a proper exercise of his discretion under Criminal Rule 31 to "poll the jurors individually" before accepting a verdict as final.[19] We are not persuaded by this argument either. It is true that the purpose of polling the jury "is to determine with certainty the approval of every juror of the verdict and to assure that no juror has been coerced or induced to agree with a verdict with which he dissents." [20] But this goal is accomplished without intruding into the jurors' deliberations and thought processes simply by asking each juror on the record in open court whether he or she agrees ("yes" or "no") with the verdict announced by the

---

**15.** 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 606.04[1][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2013).

**16.** *Khaalis v. United States*, 408 A.2d 313, 359 (D.C.1979) (quoting *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892)); *see also Sellars*, 401 A.2d at 981–82; *United States v. Williams–Davis*, 90 F.3d 490, 496 (D.C.Cir.1996) ("The exception for improper outside influence allows testimony about the fact and nature of the contact (the input, as it were), but not about the effect it produced on the juror's state of mind.").

**17.** *Tanner v. United States*, 483 U.S. 107, 120–21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); *see also Boykins*, 702 A.2d at 1247 ("Among the reasons for the rule are: (1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; and (5) maintaining the viability of the jury as a judicial decision-making body." (internal quotation marks omitted)).

**18.** *See, e.g., Sellars*, 401 A.2d at 982 (holding that jurors' misunderstanding of instructions is not a basis for impeachment of a verdict); *United States v. Black*, 843 F.2d 1456, 1464 n. 7 (D.C.Cir.1988) (holding a verdict could not be impeached by a juror's affidavit that "the anti-deadlock instructions were coercive"); *United States v. Vincent*, 648 F.2d 1046, 1049–50 (5th Cir.1981) (same).

**19.** Super. Ct.Crim. R. 31(d).

**20.** *Harris v. United States*, 622 A.2d 697, 700–01 (D.C.1993).

foreperson.[21] The poll "test[s] the uncoerced unanimity of the verdict by requiring 'each juror to answer for himself, thus creating individual responsibility, *eliminating any uncertainty* as to the verdict announced by the foreman.' "[22]

The discretion that a judge has over the conduct of a jury poll is not limitless. If the poll reveals a lack of unanimity, the judge "may either order further deliberations or declare a mistrial on the counts reflecting disagreement."[23] The judge should not "enter into an argument with the juror or require an explanation of his change of position,"[24] and of course the judge "must refrain from attempting to extract unanimity by questioning from the bench."[25] If, on the other hand, each juror agrees with the verdict without equivocation, as occurred in this case, the verdict is then final and "immutable."[26] Characterizing additional inquiry into the jurors' motivations as a legitimate continuation of the poll to confirm that their unanimous verdict was indeed uncoerced is unwarranted; the policy reasons forbidding the court from delving into the jurors' minds to explore the validity of their verdict apply as much at this stage as at other times. As the Seventh Circuit said in *Sturman,* the jury poll "is not intended to develop into a searching inquiry into the factual bases underlying the verdict," nor is it meant to be used "as a reinforcement against potentially misleading instructions" or whatever other "aspect of the case [might have been] confusing to the jury."[27]

That the trial judge in this case could have believed his instruction had led to a coerced verdict (though in point of fact he did not hold that belief) does not alter our conclusion. If anything, it reinforces it. As we discuss below, when a judge has determined from the surrounding circumstances that there is a substantial risk of a coerced verdict, inquiry into the jurors' thought processes is unnecessary. The verdict cannot stand, and the judge must declare a mistrial without further ado. Where a judge does not find a substantial risk of coercion, further inquiry of the jurors to determine if they nonetheless felt coerced is uncalled for by the circumstances and hence inappropri-

21. *See* Criminal Jury Instructions No. 2.602.

22. *United States v. Mathis,* 535 F.2d 1303, 1307 (D.C.Cir.1976) (quoting *Frady v. United States,* 348 F.2d 84 (D.C.Cir.1965) (en banc) (plurality opinion)); *see also United States v. Sturman,* 49 F.3d 1275, 1282 (7th Cir.1995) ("The purpose of the jury poll is to ensure unanimity by forcing the jurors to voice their accountability.").

23. *Lumpkin v. United States,* 586 A.2d 701, 704 (D.C.1991); *see* Super. Ct.Crim. R. 31(d).

24. *Bruce v. Chestnut Farms–Chevy Chase Dairy,* 126 F.2d 224, 225 (D.C.Cir.1942).

25. *United States v. Edwards,* 469 F.2d 1362, 1367 (5th Cir.1972).

26. *Boykins,* 702 A.2d at 1247 (holding that whether or not the jury has yet been discharged or is continuing to deliberate on oth-

er counts, "[a] verdict becomes immutable by the jury once announced in open court, or when it has been confirmed by a poll, if ordered") (quoting *United States v. Dakins,* 872 F.2d 1061, 1065 (D.C.Cir.1989)). This is the settled rule elsewhere too. *See, e.g., United States v. Marinari,* 32 F.3d 1209, 1213 (7th Cir.1994) ("Where a poll is taken, the verdict becomes final and 'recorded[ ]' when the twelfth juror's assent to that verdict is made on the record.").

27. *Sturman,* 49 F.3d at 1282 (holding that where a poll confirmed that the jurors agreed unanimously on the defendant's guilt, the trial judge was not obligated to poll them further to ensure they had complied with a special unanimity instruction requiring them to be unanimous with respect to the factual underpinnings of their verdict).

ate.[28]

■ Accordingly, we conclude that the post-verdict inquiry of the jurors in this case was improper and that we must ignore the jurors' statements in determining whether the judge's response to their third deadlock note was coercive. With that threshold question resolved, we now turn our attention to the dispositive issue in this appeal.[29]

## B.

■ A jury instruction is impermissibly coercive if it "would objectively appear to force a juror to abandon his honest conviction as a pure accommodation to the majority of jurors or the court."[30] If the instruction created a substantial risk of such coercion, the resulting verdict cannot stand.[31] "The question is one of probabili-

ties, not certainties; from our review of the record, we must be able to say with assurance that the jury arrived at its verdict freely and fairly."[32]

■ To assess whether there was a substantial risk of juror coercion, we inquire into "the inherent coercive potential" of the situation before the court and "the ameliorative or exacerbating impact" of the trial judge's actions with respect to that coercive potential.[33] The issue is not what the trial judge intended by his words, but their meaning and impact "from the perspective of the jurors."[34]

Addressing first the coercive potential in the situation that confronted the trial judge, this court has recognized the "coercive force" that is present whenever jurors disagree,[35] and the "heightened" danger of

28. There is a parallel, it is worth noting, with the limitations on judicial inquiry when, *prior* to the return of the verdict (during the trial or while the jury is still deliberating), the court is confronted with allegations of juror misconduct or improper external influences. While the judge may be obliged to inquire into the existence of such matters, the judge must take care not to "intrude on the jury's substantive deliberations" or "delve deeply into a juror's motivations." *Shotikare v. United States*, 779 A.2d 335, 340, 345 (D.C.2001) (internal quotation marks omitted). "The jurors' views of the case, the back and forth among them concerning the evidence or the application of the law to the facts, their numerical division on the merits—all such things are off limits." *Id.* Thus, the impropriety of the judicial inquiry in this case was not merely a matter of timing. Even before the jurors returned a verdict, it would have been inappropriate to ask them how the judge's comments affected their thinking. The judge could have dealt with any concerns about the effect of his remarks by calling the jury back into the courtroom and giving it a supplemental, clarifying instruction.

29. *See Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 919 (7th Cir.1991) (holding it appropriate for an appellate court to proceed to evaluate the objective risk of a coerced

verdict after concluding that the jurors' post-verdict statements on the subject must be disregarded).

30. *Winters v. United States*, 317 A.2d 530, 532 (D.C.1974) (en banc); *see also Harris v. United States*, 622 A.2d 697, 701 (D.C.1993) ("What is impermissible is a situation where the outcome is the result of coercion, i.e., where as a consequence of developments during jury deliberation or trial court action or inaction, one or more jurors feel forced to change their votes from what they individually in fact believe, and thus the verdict is not freely and fairly given.").

31. *Hankins v. United States*, 3 A.3d 356, 361 (D.C.2010).

32. *Id.* at 362 (internal quotation marks and footnotes omitted).

33. *Id.* at 361 (internal quotation marks omitted); *see also Harris*, 622 A.2d at 701.

34. *Harris*, 622 A.2d at 701.

35. *See Winters*, 317 A.2d at 532 ("[T]he major coercive force in a seemingly deadlocked jury is the obvious existence of a disagreement among the jurors.... [A] coercive force natu-

coercion that exists where the jury has "been deliberating without result for a considerable length of time and ha[s] thrice reported itself deadlocked." [36] Here, the jury had deliberated for more than eight hours over the course of two days (with an intervening weekend) and sent the judge three notes stating unequivocally, and with increasing emphasis, that it was at an impasse. Despite "several attempts to consider the evidence objectively," the jurors in each camp declared they had "absolutely no doubt" about where they stood on appellant's guilt or innocence. All twelve jurors believed they had exhausted the possibilities for reaching a unanimous verdict "based on the evidence." To be sure, the jurors reported themselves evenly divided, suggesting this was not a case in which an isolated minority might have been intimidated by the trial court's actions into surrendering to the will of the majority.[37] Nonetheless, we agree with appellant that the potential for coercion in these circumstances—the prospect that any further pressure on *this* jury to reach a unanimous verdict would induce jurors to abandon their honest convictions in order to do so—was elevated. Having decided to ask the jury to continue deliberating (a decision with which we do not take issue), it was incumbent on the judge to do so "with sensitivity and skill to alleviate coercion." [38]

■■■ Regrettably, in our view the judge's statement to the jury in response to its third deadlock note exacerbated the coercive pressures on the jurors. It usually is not coercive for a judge to respond initially to a deadlock note simply by asking the jury in neutral, careful terms to continue deliberating (i.e., before taking the next step of administering the jolt of an anti-deadlock instruction). Indeed, a pattern jury instruction is available for this purpose.[39] To give such a directive was, we have no doubt, all the conscientious and experienced trial judge in this case meant to do. But the judge did not draw on the pattern instruction, and what he actually said to the jury was not so neutrally and carefully phrased. By saying he disagreed with the jurors' unanimous belief they could not reach a verdict, adding that it was *his* job to make that kind of decision, and *then* requiring the jury to continue deliberating without further explanation, we think the judge pointedly (if unintentionally) conveyed the message that he personally wanted and expected a verdict and that the jurors would have to continue deliberating indefinitely until they had one. Arguably, at least, this message was reinforced by the otherwise proper admonition that the jurors not "under any circumstances" reveal how they were voting "until" they reached a unanimous verdict. Even if there was some ambiguity in the

---

rally exists when those in disagreement must deal face-to-face with those of opposite persuasion. It is not whether the [judge's] charge supplies coercion, for that element is already present from a desire for a decision and disagreement as to it.").

**36.** *Hankins,* 3 A.3d at 363.

**37.** *See, e.g., Smith v. United States,* 542 A.2d 823, 824 (D.C.1988) ("There is inevitably a risk of coercion whenever a jury is divided unevenly. Any effort by the court to persuade the jury to reach an agreement after reporting

its numerical split . . . may be interpreted by the minority as an implied command to agree with the majority.").

**38.** *Harris,* 622 A.2d at 707.

**39.** *See,* Criminal Jury Instructions No. 2.601(I); *see also, e.g., Van Dyke v. United States,* 27 A.3d 1114, 1119, 1124 (D.C.2011) (approving as non-coercive an instruction, based on Instruction 2.601(I), explaining to the jurors that it was "not unusual" for them still to be deliberating given the nature of the case).

judge's comments, they certainly were amenable to the interpretation we posit.

The instruction thus partook of the nature of a peremptory and deeply flawed anti-deadlock instruction. While a proper anti-deadlock instruction may communicate the *desirability* of reaching a verdict, it may not suggest (as did the instruction here) the virtual *necessity* of doing so.[40] It is well settled that a message from the judge "appear[ing] to give a jury no choice but to return a verdict is impermissibly coercive."[41] And as defense counsel argued at trial, the anti-deadlock instructions this court has approved include mandatory language making it clear that jurors should not surrender their honest convictions to return a verdict.[42] An explicit caveat of that sort, which helps to alleviate the potential coerciveness of an anti-deadlock instruction,[43] was absent from the judge's responses to the deadlock notes in this case.[44]

After the jurors heard the judge's reaction to their third note, they did not remain deadlocked for long. It is striking that in just an hour and a half, twelve evenly divided jurors who had thrice declared themselves deadlocked, and who said they had "absolutely no doubt" about their opposing views, managed to set aside their "fundamental disagreement" respecting appellant's guilt or innocence and return a unanimous verdict of guilty—a verdict, moreover, that may well have been a compromise.[45] These circumstances fur-

40. *See Jackson v. United States,* 368 A.2d 1140, 1142 (D.C.1977) ("The thinly veiled directive that the jury must come to a unanimous verdict transgressed the limits of the *Winters* charge and therefore was coercive.").

41. *United States v. (Deon) Jones,* 504 F.3d 1218, 1219 (11th Cir.2007) (citing *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)); *see also Smoot v. State,* 31 Md.App. 138, 355 A.2d 495, 501 (Md.Ct.Spec.App.1976) (holding that a trial judge's statement to the jury that he would "not accept" its deadlock declaration and would require it to "go back and do some more deliberating" was "indubitably coercive"); *cf. (Marcus) Jones v. United States,* 946 A.2d 970, 974 (D.C.2008) ("Jurors should not be told impliedly that they fail the 'test' of responsible service if they do not overcome their 'opinions' and reach agreement on a verdict.").

42. *See* Criminal Jury Instructions No. 2.601(III); *see also Winters,* 317 A.2d at 539 (Gallagher, J., concurring) (stating that a supplemental charge to a deadlocked jury should make "clear, in substance, that a verdict is *not being demanded,* and [that] the jurors are being asked to return to the jury room and 'try again' without sacrificing conscientiously held convictions"); *cf. Dean v. United States,* 938 A.2d 751, 766–67 (D.C.2007) (holding that the trial judge did not coerce a deadlocked jury to render a verdict by instructing the jurors, in the language of Instruction 2.601(I), to "keep an open mind about the case with a view to listening to the others and expressing your own point of view to see whether you can reach a unanimous decision")

43. *See Harris,* 622 A.2d at 702–03, 707 n. 20.

44. *See Jackson,* 368 A.2d at 1143 (reversing conviction where, "[u]nfortunately, the trial judge ... not only intimated that a verdict was being demanded, but he also failed to use any ameliorating language in his instruction to the effect that any change in vote had to be a conscientious one").

45. The jury acquitted appellant of first-degree premeditated murder and convicted him of the lesser-included offense of second-degree murder. We appreciate that there was a legitimate evidentiary basis to submit the lesser offense to the jury, because the testimony about an earlier altercation between appellant and the decedent, on which the government relied to prove premeditation and deliberation, was disputed. A rational jury therefore could have found that appellant committed the shooting but doubted whether the homicide was premeditated. Still, as appellant argues, the case was "tried as a pure misidentification case" and "[n]o party contended that [the] shooter did not act with premeditation and deliberation." Brief for Appellant at 33 n.26.

ther tend to substantiate appellant's contention that the verdict was coerced.[46]

On the record before us (disregarding entirely, however, the post-verdict statements of the jurors), we are unable to "say with assurance that the jury arrived at its verdict freely and fairly."[47] "[C]oercion was probable, if not certain. Thus prejudice is presumed, and reversal is mandatory."[48]

### III.

For the foregoing reasons, we vacate appellant's convictions and remand this case for a new trial.[49]

*So ordered.*

---

**46.** *See United States v. U.S. Gypsum Co.,* 438 U.S. 422, 462, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (recognizing that where the judge's statements created risk that the jury would believe "the court was insisting on a dispositive verdict," the jury's "swift resolution of the issues in the face of positive prior indications of hopeless deadlock, at the very least, gives rise to serious questions" of actual coercion); *Redeford v. State,* 93 Nev. 649, 572 P.2d 219, 221 (1977) (holding that an instruction seeming to demand a verdict could not be deemed harmless error where the previously deadlocked jury "unanimously returned what may well have been a compromise verdict" within two hours of receiving the coercive instruction).

**47.** *Hankins,* 3 A.3d at 362 (internal quotation marks omitted).

**48.** *Smith v. United States,* 542 A.2d 823, 827 (D.C.1988).

**49.** The jury's acquittal of appellant on the first-degree murder count is final; under settled double jeopardy principles, he may not be retried on that count. *See Evans v. Michigan,* —— U.S. ——, 133 S.Ct. 1069, 1080, 185 L.Ed.2d 124 (2013) ("There is no question that a jury verdict of acquittal precludes retrial, and thus bars appeal of any legal error that may have led to that acquittal.... If a trial court ... direct[s] a jury to return a verdict of acquittal, jeopardy also terminates notwithstanding any legal error...."); *Green v. United States,* 355 U.S. 184, 188–89, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) (holding that where the jury acquitted a defendant of first-degree murder, he may not be retried on that charge after his conviction on a lesser-included offense is reversed on appeal).