79 A.3d 410

**Donald Edward BROWNE, Jr.**

v.

**STATE of Maryland.**

**No. 1853, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Nov. 6, 2013.

52

Amy E. Brennan (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Robert Taylor, Jr. (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: DEBORAH S. EYLER, WRIGHT, NAZARIAN, JJ.

DEBORAH S. EYLER, J.

A jury in the Circuit Court for Charles County convicted Donald Edward Browne, Jr., the appellant, of two counts of robbery with a dangerous weapon, two counts of use of a handgun in the commission of a felony or crime of violence, two counts of first-degree burglary, one count of false imprisonment, one count of conspiracy to commit robbery with a dangerous weapon, and one count of possession of a firearm after conviction of a qualifying crime. The executed portions of the sentences imposed by the court totaled 40 years in prison.

The appellant poses five questions for review, which we have reordered and reworded as follows:

I. Did the trial court err in denying his motion for mistrial made after the jury reported for the second time that it was deadlocked?

II. Did the circuit court err in denying his motion to suppress DNA evidence?

III. Did the circuit court err in denying his motion to suppress his oral statement to Sergeant Scott Fetterolf?

IV. Must one of the convictions and sentences for first degree burglary be vacated?

V. Must the sentence for false imprisonment be merged into the sentence for one of the robbery with a dangerous weapon convictions? [1]

---

1. As framed by the appellant, the questions presented are:

 1. Did the circuit court err in denying appellant's motion to suppress DNA evidence in light of *King v. State?*
 2. Did the circuit court err in denying appellant's motion to suppress his statement made to Sergeant Scott Fetterolf?
 3. Did the circuit court abuse its discretion in denying appellant's motion for a mistrial?
 4. Must one of the two convictions and sentences for first degree burglary be vacated because only one first degree burglary was committed?

For the following reasons, we answer Question I in the affirmative, and on that basis shall reverse the judgments and remand the case to the circuit court for further proceedings. We address Questions II and III for judicial efficiency. Given our disposition, Questions IV and V are moot.

## FACTS AND PROCEEDINGS

This appeal stems from a home invasion that took place on August 18, 2009, in Newberg, a town in Charles County. At about 8:15 p.m., Royce Miller, who owns and operates the Maryland International Raceway in St. Mary's County, drove into the garage of his house, where his wife, Linda, was placing items in the trunk of her car. Suddenly, the Millers were confronted by two masked men who entered the garage. One was holding a gun. Both men were wearing gloves and black clothing that covered them completely. Only the skin under the eye holes of their ski masks was visible.

The men ordered the Millers into the house. In the mud-room, the unarmed man pushed Mrs. Miller to the ground, taped her hands behind her back, and took her diamond wedding ring. The man with the gun forced Mr. Miller into the kitchen and ordered him to get on the ground. He refused. The gunman then directed Mr. Miller to empty his pockets, which he did, placing his wallet, some folded currency, and a cell phone on the kitchen counter. The gunman asked Mr. Miller where their safe was located. The safe was not upstairs, but Mr. Miller told the gunman it was, because he wanted to get the man away from his wife and because he had a gun of his own upstairs and he wanted to access it.

The gunman and Mr. Miller went upstairs. Mr. Miller showed the man where Mrs. Miller's jewelry box was located. As Mr. Miller was trying to figure out what to do next, the Millers' son Christopher drove up the driveway. The man

---

5. Must the sentence for false imprisonment merge into the sentence for robbery with a dangerous weapon pursuant to *Snowden v. State?*

(Footnotes omitted.)

downstairs yelled, "We've got to go!" The gunman ran downstairs, and the two men ran across the Millers' property, jumping over their fence and damaging the top of it. Mr. Miller retrieved his gun, and as the men fled he fired two shots outside, from a balcony, and yelled, "The next one's through your skull!" The men made off with the cell phone and cash from the kitchen counter, and the wedding ring.

Christopher saw the two men running away and jumping over his parents' fence. One of the men pointed a gun at him. Christopher went inside the house and found his mother; he removed the duct tape from her wrists. Mrs. Miller called 911, and the police responded to the scene.

The next day, Mr. Miller walked through the neighborhood to see if he could find any evidence related to the crime. He was accompanied by a neighbor, Carroll Walker, who usually walked through the neighborhood twice a day. Mr. Walker told Mr. Miller that he had seen two gloves near a goat pen owned by Charles Harley, another neighbor. The Millers went to look at the gloves, and recognized them as the ones that had been worn by the man who had forced Mrs. Miller to the ground and had taken her wedding ring. Members of the Sheriff's Department and an evidence technician came to the property where the gloves were found and collected them. According to Mr. Walker and Mr. Harley, the gloves had not been on that property between 6:30 and 7:30 the evening before, when the men last had checked that area to make sure the goats were safe.

The gloves were provided to Bode Technology for testing. On January 29, 2010, experts there obtained DNA profiles from the gloves. The DNA profiles were uploaded into CODIS (the Combined DNA Index System). As we shall explain, that eventually led to a DNA match to the appellant's DNA, which then led to the appellant's arrest and indictment.

At trial, the State called Mr. and Mrs. Miller; Mr. Walker, Mr. Harley, and Laureen Haynes, all neighbors of the Millers; Christopher Miller; Sergeant Scott Fetterolf, Detective Chris Shankster, Detective Charles Gass, Technician James Am-

mons, and Sergeant Erica Budd, all of the Charles County Sheriff's Office; Tiffany Keener and Dr. Leslie Mounkes, forensic DNA experts with the Maryland State Police; and Stephanie Sivak, Tiffany Meadows, and Michelle Donahue, forensic DNA analysts with Bode Technology. The defense did not call any witnesses. The police officers testified about interviews they conducted with the appellant.

Mr. Miller testified that the appellant's father owns a paving company that in the past several years had done six to eight jobs for the speedway Mr. Miller owns. About 75% to 80% of the business transacted by the speedway is paid in cash, and Mr. Miller had paid the appellant's father in cash. The appellant had accompanied his father on some of those jobs, and had seen Mr. Miller pay his (the appellant's) father in cash amounts of $2,500 to $3,000.

We shall include additional facts as pertinent to the issues.

## DISCUSSION

### I.

The appellant contends the trial court abused its discretion by denying his motion for mistrial made after the deliberating jurors revealed for a second time that they were deadlocked, identifying a particular juror who was holding out for a not guilty verdict (and who previously had identified himself to the court as the single holdout juror). We review the denial of a mistrial motion for abuse of discretion. *Dillard v. State*, 415 Md. 445, 454, 3 A.3d 403 (2010). It is within the trial judge's discretion to require an apparently deadlocked jury to continue deliberating or to declare a mistrial. *Mayfield v. State*, 302 Md. 624, 632, 490 A.2d 687 (1985). Whether the trial judge abused his or her discretion in denying a mistrial motion in a deadlock situation depends on the circumstances of the particular case. *Id.*

The facts relevant to this issue are as follows. The jury retired to deliberate at 5:10 p.m., after closing arguments on the second day of trial. At 6:50 p.m., the foreman sent a note

saying, "The jury is deadlock [sic] on all counts we will not be able to reach a verdict." The trial judge told counsel about the note and proposed to instruct the jurors to keep deliberating, given that they had not been deliberating long. Counsel agreed. The jurors were returned to the jury box and were so instructed by the court.

Immediately after the judge stopped speaking, Juror No. 281 asked to approach the bench, and was allowed to do so. That juror and counsel convened at the bench and the judge asked, "Okay, what's the situation?" The juror replied, "Mam, [sic] I'm the one that, I can not, with the evidence that's been presented here say that Mr. Browne was...." The judge interrupted, and the following colloquy took place:

THE COURT: Okay, I'm going to stop you.

JUROR: Yes mam [sic].

THE COURT: Because you have not been deliberating very long.

JUROR: Yes mam.

THE COURT: *You need to go back, listen to your fellow jurors, consider all of the evidence very, very carefully. And can you continue your discussions. I'm not arguing with you, I'm just simply saying ...*

JUROR: No mam, no mam, I don't take that way [sic].

THE COURT: ... it really has not been very long.

JUROR: Yes mam.

THE COURT: Okay ... Counsel have any suggestions, comment?

[DEFENDANT'S ATTORNEY]: Just to remember what the instructions were at the beginning of the case.

THE COURT: They are.

[DEFENDANT'S ATTORNEY]: All of the instructions.

THE COURT: *I'm simply asking you to review all of the evidence. Look through the written jury instructions yourself.*

JUROR: Yes mam.

THE COURT: *Consider everything. Consult and discuss with your fellow jurors and we'll see where we are.*

JUROR: Yes mam.

(Emphasis added).

Juror No. 281 returned to the jury box and the jurors were escorted to the jury room, where they resumed deliberations.

At around 8:10 p.m., the foreman sent the following note:

Jury [sic] # 281 has examined the evidence and read the instructions and has not changed his position as such the jury remains deadlock [sic] and a decision cannot be made . . . .

The court presented the note to counsel and asked for suggestions and comments. The prosecutor suggested that the jurors be sent home for the night so they could return the next morning to "start fresh." Defense counsel moved for a mistrial, stating, "since they're unable to reach a verdict I would be asking for a mistrial at this time," and that "they've already been instructed to go back since, with the same issue."

The court denied the mistrial motion, ruling:

We've had a two day trial with a lot of evidence presented today. And in the overall scheme of things they have been deliberating three hours at the most since it also involved ordering dinner and a couple of smoke breaks and making phone calls before they even started. So, I think it's appropriate to bring them back tomorrow morning. I'll ask them to be in at 9 a.m. So let's bring them back in and say so.

The jurors were returned to the courtroom and were told only that they were being sent home for the night and to return in the morning.

Deliberations resumed the next day at 9:32 a.m., after the judge advised the members of the jury to "[p]lease take your time. It's a good idea to go back to the definitions of the crimes that were charged and go through each one of the elements one by one." At 10:35 a.m., the foreman sent a note

stating that the jury had reached a verdict. The verdict was returned and confirmed by polling.

The appellant argues that under the circumstances that existed the trial court abused its discretion by denying his motion for mistrial. He maintains that the judge's individual instruction to the self-identified holdout juror, combined with her merely sending the jurors home for the night after the second deadlock note, in which the foreman singled out the self-identified holdout juror as the cause of the jury's inability to reach a verdict, was coercive. He takes the position that a mistrial should have been granted to prevent a verdict that was the product of jury coercion.

The State counters that by denying the mistrial motion the trial court properly exercised its broad discretion to assess whether the jury in fact was hopelessly deadlocked. It points out that, under *Mayfield*, a trial judge is not required to declare a mistrial simply because an apparently deadlocked jury voluntarily reveals its numerical split. 302 Md. at 631–32, 490 A.2d 687. Under the circumstances here, the State argues, the court's actions were not coercive and a mistrial was not necessary.

 The right to a jury trial in a criminal case is guaranteed by the Sixth Amendment to the federal constitution and by Article 21 of the Maryland Declaration of Rights.

> One of the requirements embodied in the right to a jury trial is that of a unanimous verdict. With respect to unanimity [the Court of Appeals has] stated: "The verdict is the unanimous decision made by a jury and reported to the court, on the matters lawfully submitted to them in the course of the trial. Unanimity is indispensable to the sufficiency of the verdict." *Smith v. State*, 299 Md. 158, 163–64, 472 A.2d 988 (1984)....

*Butler v. State*, 392 Md. 169, 181, 896 A.2d 359 (2006) (emphasis omitted) (citation omitted) (holding that when a jury note revealed that one juror expressed a general disbelief of the police during deliberations, it was coercive for the trial court to instruct the jury that taking such a position after having

been asked in *voir dire* whether such a belief was held, and having answered negatively, could be a violation of the juror's oath); *see also Caldwell v. State,* 164 Md.App. 612, 635, 884 A.2d 199 (2005) ("The concept of unanimity . . . embraces not only numerical completeness but also completeness of assent, *i.e.,* each juror making his or her decision freely and voluntarily, without being swayed or tainted by outside influences.").

Several Maryland appellate opinions addressing the potential for judicial coercion of a verdict in a criminal case involve the giving of an *Allen*-type instruction to a deliberating jury after the jury has revealed that it is deadlocked.[2] The wording of the traditional *Allen* charge "encourages jurors to reach a verdict by stressing deference of the minority jurors to the views of the majority." *Thompson v. State,* 371 Md. 473, 483 n. 5, 810 A.2d 435 (2002). The Court of Appeals has disapproved of the traditional *Allen* charge, reasoning that it has a coercive effect on minority jurors, and instead has approved the modified *Allen* charge recommended by the American Bar Association ("ABA").[3] *See Burnette v. State,* 280 Md. 88, 96,

---

**2.** The *Allen* charge gets its name from *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), in which the Supreme Court sanctioned an instruction a trial court may give to a deadlocked jury.

**3.** Standard 15–5.4, ABA Standards for Criminal Justice: Discovery and Trial by Jury, Third Edition, American Bar Association, 1996. The Standard in the Third Edition contains no substantial deviation from the Standard approved by the Court in earlier editions. Standard 15–5.4 provides:

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:
(1) that in order to return a verdict, each juror must agree thereto;
(2) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
(3) that each juror must decide the case for himself or herself but only after an impartial consideration of the evidence with the other jurors;
(4) that in the course of deliberations, a juror should not hesitate to reexamine his or her own views and change an opinion if the juror is convinced it is erroneous; and
(5) that no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

371 A.2d 663 (1977) (observing that the ABA-recommended instruction "does not charge the minority to doubt the reasonableness of its convictions when they are not concurred in by the majority.... All jurors, in the approved charge, are encouraged to deliberate and consult with one another. The minority is not portrayed as somehow the cause of the deadlock." [4]). Maryland Criminal Pattern Jury Instruction (MPJI–Cr) 2:01 substantially follows the language recommended by the ABA.

■ When a jury reveals that it is deadlocked and volunteers the numerical breakdown of its split, there is an increased risk that the trial judge's remarks in response will be coercive. In *Smoot v. State*, 31 Md.App. 138, 355 A.2d 495 (1976), on which the appellant relies, within a span of a few hours a deliberating jury twice reported that it was deadlocked. Both times the jurors disclosed the majority and minority breakdown. After the first jury note, the judge instructed the jurors that he would "not accept" that they could not reach a verdict, and directed them to continue deliberating. 31 Md.App. at 141, 355 A.2d 495. The judge did not disclose to counsel the precise contents of the note—including that it contained a breakdown of the jurors' votes—

---

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in section (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement.

4. As the *Butler* Court explained:

In *Burnette*, the instruction stated, "If your views are contrary to those of the vast majority you should consider whether your views, which make no impression on the minds of so many equally intelligent jurors, are correct." In response to that language [the *Burnette* Court] stated: "It is difficult to imagine a minority juror who would not be placed in some discomfort on hearing this instruction. Criticism runs directly to him, and he might understandably conclude that proper 'deference' to the opinions of the majority demands that he abandon his conscientious position."

392 Md. at 186, 896 A.2d 359 (emphasis omitted) (citations to *Burnette* omitted).

until after he instructed the jurors to continue deliberating. When defense counsel asked to be told the contents of the note and learned that it contained a vote breakdown, he moved for a mistrial, arguing that the court's instruction was coercive. The court denied the motion.

The second note reporting a deadlock came after the jurors had had dinner for almost two hours and then spent slightly more than an hour deliberating. It repeated the same breakdown (eight in favor of guilty and four in favor of not guilty). Defense counsel again moved for a mistrial. The trial judge told counsel he simply would tell the bailiff to let the jurors know they should continue deliberating.

About an hour later, not in response to any new note, the trial judge called counsel to the bench and said he was going to bring the jurors into the courtroom and give them the ABA-recommended *Allen* charge. Defense counsel objected, arguing that, after five hours of actual deliberation time and two notes reporting a clear split among the jurors, allowing the jurors to deliberate further would be coercive. Defense counsel again moved for a mistrial. The court denied the motion and gave the jurors the modified *Allen* charge. About fifty minutes later the jury returned a guilty verdict.

On appeal, this Court held that the trial judge had exercised coercive influence on the verdict by telling the jury, in the face of a disclosed split, that he would not accept their deadlock; by giving an *Allen*-type instruction after the jury's second note revealed it still could not agree and again gave the majority/minority split; and by not admonishing the jury to refrain from disclosing the details of their division after they already had done so. On this last point, we opined:

> [T]he jury twice volunteered the details of their division. After the first disclosure, they should have been admonished by the court, and counselled [sic] against any repetition. In the absence of such a cautionary instruction, the second disclosure of their split . . . was even more explicit and more improper.
>
> . . .

> In response to the plaintive inquiry on the "bottom line" of their note, "What do we do now?", the trial court, under the circumstances then existing in this case, should have granted the [defendant's] motion for a mistrial and sent them home. To require, as he did, another hour of deliberation and then *sua sponte* to administer the *Allen*-type charge ... was an abuse of discretion....

*Id.* at 151–52, 355 A.2d 495.

In *Mayfield v. State*, 302 Md. 624, 490 A.2d 687, upon which the State relies, the Court of Appeals was asked by the defendant on appeal to accept as a general proposition that "when a jury becomes deadlocked and voluntarily reveals its numerical split, it is always coercive for the trial judge to give an ABA recommended *Allen*-type instruction." 302 Md. at 632, 490 A.2d 687. The Court declined to do so.

In that case, after deliberating for about five hours, the jurors sent a note listing the vote breakdown on each count and stating that they could not reach a unanimous verdict. On four counts, the breakdown was eleven for guilty and one for not guilty. On the remaining count the split was nine for guilty and three for not guilty. The note did not identify the individual juror's votes.

The court informed counsel of the note and its contents and that it was going to give the ABA-recommended *Allen* charge. Defense counsel moved for a mistrial, which was denied. The court gave the modified *Allen* charge and the jurors retired to continue deliberating. Defense counsel renewed his mistrial motion twice thereafter, as the jurors continued to deliberate, complaining that by allowing deliberations to continue when there was a revealed eleven to one split in favor of a guilty verdict on most counts, the court was giving the eleven juror majority the opportunity to " 'hound my one guy into conviction.' " *Id.* at 628, 490 A.2d 687. The court reserved on the renewed motions. About one hour and forty minutes after the jurors had been returned to deliberate, they sent a note saying they had reached a verdict on all counts except one. The court declared a mistrial on that one count (on which the

jurors had been split nine to three) and took the verdict on the remaining counts. The defendant was found guilty on each count.

As noted, on appeal, the defendant argued that giving a modified *Allen* charge to a jury that has volunteered its numerical breakdown is coercive as a matter of law. The Court opined, to the contrary, that the particular circumstances of the case will dictate whether a trial judge's actions amounted to coercion. Interestingly, the Court observed:

> It is possible ... that a single minority juror might feel coerced by an ABA approved *Allen*-type charge when that juror believes that the trial judge is aware that there is only one holdout. On the other hand, if a trial judge in this situation were simply to direct that the jurors continue deliberations, without giving any instruction concerning their responsibilities, the lone holdout might also infer that the directive was aimed at him. An instruction to continue deliberations, without any amplification, may arguably be more coercive upon the minority than the ABA recommended *Allen*-type charge. Such unexplained instruction would not contain the ABA approved language which emphasizes "individual judgment," the need to "decide the case for yourself" and the refusal to "surrender your honest conviction ... because of the opinion of your fellow jurors or for the mere purpose of returning a verdict."

*Id.* at 631, 490 A.2d 687. The Court held:

> We believe that it would be sheer speculation to conclude that, when a jury becomes deadlocked and voluntarily reveals its numerical split, it is always coercive for the trial judge to give an ABA recommended *Allen*-type instruction. This is particularly true in light of the charge's repeated stress upon the need for each juror's individual judgment and the obligation of each juror to adhere to his own convictions.

*Id.* at 632, 490 A.2d 687. The Court concluded that, under the circumstances, the trial court did not abuse its discretion in

giving the modified *Allen* charge and denying the motion for mistrial.[5]

Although different in procedural posture from the case at bar, a series of cases decided by the District of Columbia Court of Appeals concerning judicial coercion of a verdict in the face of a polling breakdown is instructional on the concept of verdict coercion and the best analysis to be used by an appellate court in assessing whether a verdict was the product of coercion. In *Crowder v. United States*, 383 A.2d 336 (D.C.1978), the foreperson announced guilty verdicts on charges of second-degree burglary and grand larceny. On polling, however, the twelfth juror said she had found the defendant guilty on the burglary charge but not guilty on the larceny charge, because of a lack of evidence. The court instructed the jurors to

> return to the jury room for further consideration of your verdict, and when you have reached a unanimous verdict, you may return to the court. If it's not unanimous, then you continue your deliberations. After you return to the jury room, any member is free to change his or her vote on any issue submitted to you. Each juror is free to change his or her vote until the jury is discharged.

*Crowder*, 383 A.2d at 341. Forty minutes later, the jurors returned a verdict of guilty on the burglary charge.

---

**5.** Recently, in *Hall v. State*, 214 Md.App. 208, 75 A.3d 1055 (2013), we addressed whether a trial court erred in giving a modified *Allen* charge that was partially *ad libbed*. During deliberations, the jurors sent a note saying that there was a holdout juror and they would not be able to reach a unanimous verdict for that reason. At that point, the court gave the modified *Allen* charge. The jurors then resumed deliberating and reported that they had reached a verdict. The foreperson announced guilty verdicts on counts one and two and a not guilty verdict on count three. During polling, one juror stated she disagreed with the guilty verdict on count two. The court took the verdicts on counts one and three and declared a mistrial on count two.

We held that the modified *Allen* charge given by the trial judge was not legally incorrect. The defendant also had argued that the instruction coerced the verdict, given that there was a revealed split, which likely was eleven to one in favor of guilt. We did not address that issue because the only count on which a split was revealed was the count on which the trial court ultimately declared a mistrial.

On appeal, the *Crowder* court held that the trial court had abused its discretion by returning the jurors to deliberate after the poll revealed the exact split in the vote and the identity of the dissenting juror. The court noted that there is an "inevitable increase in potential coerciveness" that happens when the numerical division of the jury vote and the identity of a lone dissenting juror is revealed in open court. *Id.* at 343. Reasoning that it is the duty of the trial judge to alleviate the potential for coercion of a verdict created by a polling breakdown, the court observed, in a footnote, that the trial judge could have accomplished that by giving an instruction such as the ABA-recommended *Allen* charge. Specifically, the court stated that the situation

> justified a further attempt to dissipate the potential coerciveness inherent whenever the twelfth juror's dissent is revealed in open court and the jury is instructed to continue its deliberations. The most obvious danger in such a situation is that the lone recalcitrant juror will conclude that the trial judge is requiring further deliberations in order to eliminate his dissent. To allay any such fears, the trial judge might consider [giving an instruction similar to the ABA recommended *Allen* charge].

*Id.* at 342 n. 11.[6]

In *Harris v. United States*, 622 A.2d 697 (D.C.1993), the court drew upon its holding in *Crowder* in concluding that the trial court did not abuse its discretion by allowing jurors to continue deliberating after a polling breakdown. The case

---

6. The instruction the *Crowder* court recommended was:

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

> 383 A.2d at 342 n. 11.

was tried against two defendants. After a full day of deliberations, the jurors reported that they had reached verdicts and the foreperson announced verdicts of guilty on all three counts against each defendant (second degree murder, possession of a firearm while committing a crime of violence, and carrying a pistol without a license). During polling, the twelfth juror said she only agreed with "[p]art of it and not all of it." *Harris*, 622 A.2d at 699. The trial judge immediately sent the jurors to the jury room to continue deliberating. Defense counsel moved for a mistrial on the ground that the circumstances placed undue pressure on the twelfth juror to change her vote. The court denied the motion. Later that evening, the jurors sent a somewhat curious note saying they all agreed that they could not reach a unanimous verdict. At that point, they were sent home for the night.

When the jurors returned the next morning, the court instructed them, in relevant part:

> Each of you is free to change your mind on any count against either defendant if you decide to do so, but you are also free not to change your mind even if other jurors disagree with you, and you should not do so simply for the purpose of reaching a verdict unless you are persuaded to change based on the evidence and your further discussions with your fellow jurors.

> Remember that you are not partisans or advocates for any party in this matter. You are judges of the facts, you must decide the case based solely on the evidence, without prejudice, fear, sympathy, or favor for or against any party. To that end, I remind you that in your deliberations in the jury room your purpose should not be to support your own opinion, but to discuss the case with your fellow jurors with an open mind and to ascertain and declare the truth based on the evidence.

*Id.* at 700.

The jurors deliberated for two more full days, occasionally sending status notes saying they had not yet reached a unanimous verdict. No responses were requested or given.

On the morning of the third day, after deliberating for an hour, the jurors reached verdicts of guilty on all counts against the defendant and guilty on one count against the co-defendant, which were confirmed by polling.

On appeal, the defendant argued that the trial court had abused its discretion by allowing the jurors to deliberate after the initial poll revealed a single holdout juror, and that, in that circumstance, the verdict was coerced. In affirming the judgments, the appellate court, relying upon *Crowder*, explained that the analysis of the coercion question is two-pronged. First, the reviewing court must determine "the existence or degree of inherent coercive potential" in the circumstances. *Id.* at 705. The court identified a non-exclusive list of factors relevant to this determination:

the degree of isolation of a dissenting juror (or jurors), whether the identity of a dissenting juror (or jurors) is revealed in open court as opposed to in a note, whether the exact numerical division of the jury is revealed, whether the judge knows the identity of a dissenting juror (or jurors) and whether the juror is aware of the judge's knowledge, whether other jurors may feel "bound" by a vote they have announced, and whether an "anti-deadlock" instruction has been given and, if so, whether this has occurred under circumstances where the potential for coercion is high.

*Id.* Second, the reviewing court must combine its assessment of the inherent coercive potential "with an evaluation of how the judge reacted to the situation." *Id.* (Footnote omitted).

Did the judge make affirmative efforts to dispel any coercive potential? Did the judge take a middle course and act (or refrain from acting) in a reasonable and neutral way? Did the judge perhaps compound the problem by actions effectively adding to juror pressure? Did the judge independently create a situation of coercive potential?

*Id.*

On the first prong of its analysis, the *Harris* court determined that "[t]he situation itself had a great deal of inherent coercive potential[.]" 622 A.2d at 705–06. The twelfth juror

disagreed at least in part with the verdict as announced, in open court, and thus was "isolated in her dissent to some degree, the judge and fellow jurors knew it was she that dissented, and the other jurors had already 'declared' their views on at least [the defendant's] verdict." *Id.* at 706. It was clear from the circumstances that the numerical split was eleven to one, at least on some counts. The court found, however, that the dissenting juror "was not disagreeing unequivocally with a verdict relating to a single defendant-there were two defendants whose verdicts had been announced." *Id.* Thus, it was not clear that the juror was dissenting from the verdict on the counts against the defendant, as opposed to the verdict on the counts against the co-defendant. Moreover, even if the juror was dissenting from the verdict on the counts against the defendant, she did not state why, and only remarked that she disagreed with "part of it." *Id.*

On the second prong of its analysis, the court concluded that, although there was great inherent coercive potential in the situation, the trial judge "acted with sensitivity and skill to alleviate coercion" by not giving an anti-deadlock instruction after the twelfth juror dissented during polling and by not otherwise singling the juror out; by sending the jurors home after they sent a note saying they were in disagreement; and by giving a charge after the jurors returned the next day that reduced the potential for pressure on the holdout juror to agree to a guilty verdict. *Id.* at 707.

Recently, in *Brown v. United States,* 59 A.3d 967 (D.C. 2013), the same court reversed judgments against a criminal defendant, holding that the circumstances that existed after a breakdown in polling created a high potential for coercion and the trial judge did not take sufficient action to dispel the potential for a coerced verdict. There, five defendants were tried together on related conspiracy charges. The deliberating jury sent a note reporting that it had reached a verdict on some charges against some defendants but was deadlocked on other charges. The court asked the jurors to complete the verdict form for those defendants for whom verdicts had been reached. They did so and, with respect to defendant Brown,

returned guilty verdicts on five counts and a not guilty verdict on the sixth count. During polling on the verdicts as to Brown only, the eleventh juror answered "no" as to whether he agreed with the verdict announced by the foreperson.

The court stopped the poll and in a bench conference denied Brown's counsel's motion for mistrial and said it was going to ask the jurors to continue deliberating as to Brown and the other defendants. The court did so, simply telling the jurors that because they had not reached a unanimous verdict, they were to continue their deliberations.

When the jurors resumed deliberating, Brown's counsel again moved for a mistrial, arguing that the breakdown during polling would have a coercive effect on the deliberations. The court denied the motion again, but agreed to the government's request for a written instruction to the jurors stating:

> In the polling of the jury, it has become apparent that you may not have reached a unanimous verdict. For this reason, I am asking you to return to the jury room for further consideration of your verdict. If you are unanimous, your foreperson should send me a note indicating that, and I will poll you again. If you are not unanimous, please resume deliberations and see if you can reach a unanimous verdict.

*Brown*, 59 A.3d at 970 n. 3. Less than ten minutes after they were returned to the jury room to deliberate, the jurors reported that they had reached a verdict. The verdict was returned and was confirmed by polling. Brown's counsel again moved for a mistrial, which was denied.

The appellate court held that the circumstances of the polling breakdown carried a very high potential for coercion of the jury verdict and that the trial judge did not take adequate steps to dispel that potential. The court observed:

> We recognize that for those who have never participated on a jury, the suggestion that there may be pressure of any kind from a trial judge's unelaborated instruction—as in this case—to resume deliberations after a jury poll breakdown may seem fanciful. But the reality of participating on a jury is quite different from thinking about it in the abstract.

As our case law makes clear, for the juror exposed in open court as a dissenter from an announced unanimous verdict, the pressure to conform is real when the judge requires further deliberations with virtually unanimous jurors of a contrary mind—*unless* the judge assures the dissenter, indeed all jurors, that none should surrender honest conviction and that each is free to change his or her mind. The concern here, therefore, is for all jurors. Without a clearer, more specific instruction [than was given], the other jurors, not just the announced dissenter, may be unsure about what options are open to them if the dissenter stands pat.

59 A.3d at 975–76 (emphasis in original).

In *U.S. v. Williams*, 547 F.3d 1187 (9th Cir.2008), the Court of Appeals for the Ninth Circuit took a less nuanced approach in a case that, procedurally, is more similar to the case at bar. In *Williams*, during deliberations, a holdout juror sent a note to the court stating that she disagreed with the other jurors on two counts, which she identified, and that she was being "bombarded" by the other jurors to change her mind. In response, and over a motion for mistrial by the defense, the trial court gave the jury a modified *Allen* charge. About five hours later, the jury returned a unanimous verdict of guilty on all counts.

On appeal, Williams argued that, under the circumstances, it was coercive for the trial court to give the modified *Allen* charge, instead of granting a mistrial. The Court of Appeals agreed. It stated: "When a juror clearly discloses to the [trial] court that she disagrees with the rest of the jury and that she cannot return a different verdict . . . the [trial] court cannot give a supplemental instruction instructing the jury to continue deliberating." *Williams*, 547 F.3d at 1207. The court observed that when there are holdout jurors who are identified to the court, and know the court knows who they are, "the holdout jurors could interpret the [instruction to continue deliberating, including a modified *Allen]* charge as directed specifically at them[.]" *Id.* (quoting *U.S. v. Ajiboye*, 961 F.2d 892, 894 (9th Cir.1992) ("[W]hen the judge . . . is inadvertently told of the jury's division, reversal is necessary

if the holdout jurors could interpret the charge as directed specifically at them—that is, if the judge knew which jurors were the holdouts and each holdout juror knew that the judge knew he was a holdout.") (emphasis omitted)).

 With these concepts in mind, we return to the case at bar. The right to a jury trial hinges upon unanimity in number and assent. At the same time, because declaring a mistrial when a jury is not hopelessly deadlocked undermines judicial efficiency, it is essential that deadlocked jurors be allowed to continue deliberating when the deadlock may properly be broken, but not when it is likely that the deadlock will be broken by coercion of a holdout juror (or more than one holdout jurors). We find helpful the factors the District of Columbia Court of Appeals determined to be relevant in assessing the inherent potential in a given situation for coercion of a verdict: the degree of isolation of a holdout juror; whether the court knows the numerical breakdown of the deadlock and, more specifically, whether the holdout juror is the sole holdout; whether the holdout juror has been identified to the court and knows that the court is aware of his or her identity; whether the holdout juror has been identified in a note only or in open court; whether the other jurors may feel they are bound to the positions they have taken; and whether a modified *Allen* charge has been given.

Taking these factors into account, we conclude that the total circumstances that existed when the jurors first were sent back to the jury room to continue deliberating, and especially when they were brought back in the morning to continue deliberating after their second note, created an extremely high inherent potential for coercion of the verdict. After the first deadlock note and the court's instruction for the jurors to continue to deliberate, Juror No. 281 presented himself to the judge and made clear from his words that he was the only holdout juror ("I'm the one ..."), and that his reason for holding out against findings of guilt was that he did not think there was evidence sufficient to convict the appellant ("I can not, with the evidence that's been presented here say that Mr.

Browne was . . ."). Thus, at that stage of events, there was a
self-identified lone holdout juror, whose identity was known to
the other jurors and had become known to the court and
counsel, and who knew that everyone knew his identity. As
the foreman's later note made clear, the other jurors knew
that Juror No. 281, in approaching the bench, had made his
status as the holdout juror known to the court and counsel.
Although the judge stopped Juror No. 281 before he could say
anything more, the "cat was out of the bag." At that point, a
significant potential for coercion of the verdict arose. The
judge's actions thereafter either could have increased or de-
creased that potential.

It would have been best had the court not allowed any
individual juror to approach the bench when the jury had just
reported a deadlock and had been instructed to resume delib-
erating. It was predictable, given the circumstances, that a
juror asking to approach would communicate information
about the nature of the deadlock. Juror No. 281 was allowed
to approach, however, and we must gauge whether the inher-
ent potential for coercion, which became significant when
Juror No. 281 communicated with the judge at the bench, was
exacerbated or lessened by the actions of the trial judge in the
circumstances as they evolved. Under the Court's holding in
*Mayfield*, once Juror No. 281 identified himself as the lone
holdout, the judge might have sought to decrease the potential
for coercion by giving the entire jury the ABA-recommended
*Allen* charge, which emphasizes "individual judgment, the
need to decide the case for yourself and the refusal to surren-
der your honest conviction . . . because of the opinion of your
fellow jurors or for the mere purpose of returning a verdict."
*Mayfield*, 302 Md. at 631, 490 A.2d 687 (internal quotation
marks omitted).

Instead, during the bench conference, the judge gave the
holdout juror an individual instruction that did not contain the
safeguards of the modified *Allen* charge. The juror should
not have been instructed individually. A jury deadlock only
can be properly broken by the joint assent of all the jurors.
The deadlock is not a personal problem laid at the feet of the

holdout juror or jurors. It is a group dynamic problem. Individually instructing a single holdout juror in a deadlock situation can shift that dynamic, creating the impression that the deadlock is of the holdout's making. Moreover, the individual instruction that was given to Juror No. 281 directed him to listen to his fellow jurors, but did not provide any counterbalancing language informing him that he should not surrender his honest conviction because of his fellow jurors' opinions. *See Taylor v. State,* 17 Md.App. 41, 48, 299 A.2d 841 (1973) (holding that trial judge had "exerted undue pressure and coercion upon the minority juror" when, after being informed of an eleven to one split, he remarked: " '[I]t's up to the one to change' without any admonition whatever that the minority juror should vote in accordance with his conscientious beliefs . . . ."). The giving of an individual instruction to the self-identified holdout juror and the nature of the instruction given increased the likelihood of a coerced verdict.

The events that took place after this faulty directive further increased the likelihood of coercion. As in *Smoot,* the trial judge in this case did not admonish Juror No. 281, or the jury as a whole, to refrain from again divulging the details of their deadlock. *See* 31 Md.App. at 151–52, 355 A.2d 495. As a consequence, the foreman's second note revealed that the deadlock had continued, with Juror No. 281 remaining the lone holdout. Also, the contents of the second note made clear that Juror No. 281 had told the other jurors that the judge had told him to examine the evidence, read the instructions, and listen to the views of his fellow jurors. In the second note, the foreman echoed the court's private instruction to the holdout juror, stating, "number 281 has examined the evidence and read the instruction, has not changed his position."

This second jury note is troubling not only because it once again identifies the holdout juror but also because it strongly suggests a basic misconception about the deliberative process on the part of the eleven other jurors: that it no longer was their job to deliberate as a group in an effort to resolve their differences and reach a unanimous verdict, which could entail changing their own minds. Rather, it was Juror No. 281's job

to "review all of the evidence" and "look through the written jury instructions" and decide whether he would change his mind. The note strongly suggests that the holdout juror would have held the same misconception, *i.e.*, that the deliberations no longer were a group effort, but were a matter of whether he would change his mind.

By giving no response to the jurors' second deadlock note other than to send them home for the night with instructions to return in the morning to resume deliberations, the trial judge likely created the impression in Juror No. 281's mind that further deliberations were being required "in order to eliminate his dissent." *See Crowder*, 383 A.2d at 342 n. 11. This was an abuse of discretion. Indeed, we cannot conclude that, at that point in the evolution of events, this impression would have been dispelled by a modified *Allen* charge. The only proper ruling after the second jury note reporting a deadlock was to grant the defense motion for a mistrial. Accordingly, we shall reverse the judgments.

## II.

The appellant contends the circuit court erred in denying his motion to suppress DNA evidence. In particular, he maintains that evidence that his DNA profile matched the DNA profile obtained from the gloves retrieved from Mr. Harley's property should not have been admitted into evidence. In his brief, he relies upon *King v. State*, 425 Md. 550, 42 A.3d 549 (2012), in which a majority of the Court of Appeals held that it is a violation of the Fourth Amendment for the police to obtain DNA by means of a buccal swab from a person who is under arrest for a violent crime (as opposed to having been convicted of a violent crime). After the appellant's brief was filed, the United States Supreme Court reversed the decision of the Court of Appeals. *Maryland v. King*, 569 U.S. ——, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013). The Supreme Court held that it does not violate the Fourth Amendment rights of a person who has been arrested for a violent crime for the police to obtain a DNA sample from that person by means of a buccal swab.

In the case at bar, on February 3, 2010, the appellant was arrested in Baltimore County on charges including a crime of violence. These charges were unrelated to the crimes committed against the Millers in Charles County. While under arrest in Baltimore County, the appellant's DNA was collected by means of a buccal swab. The DNA profile thus obtained was entered into CODIS, and produced a match to the DNA that had been recovered from the glove the Millers identified as having been worn by one of the robbers who perpetrated the home invasion, and that had been uploaded into CODIS on January 29, 2010. Ultimately, the Baltimore County charges against the appellant were *nolle prossed.*

Based on the CODIS match, Sergeant Fetterolf obtained a search warrant for a buccal swab from the appellant. The swab was performed, a DNA profile was extracted from it, and that DNA profile was shown to match the DNA collected from the glove found on Mr. Harley's property.

The appellant argues that his Fourth Amendment rights were violated when the buccal swab was obtained in Baltimore County when he was under arrest; and, as the DNA that resulted from that swab produced the CODIS match that then served as probable cause for the search warrant by which an additional DNA sample was obtained from him, that sample and the fact that it matched the DNA profile from the glove should have been excluded from evidence.

This argument has been superseded by the United States Supreme Court's decision in *Maryland v. King.* It is now established law that obtaining a buccal swab DNA sample from a person under arrest for a violent crime is not a violation of that person's Fourth Amendment rights. Thus, the premise for the appellant's argument that the DNA evidence against him should have been suppressed is not valid. Accordingly, the circuit court did not err in denying the appellant's motion to suppress the DNA evidence.[7]

---

7. Very recently, the Court of Appeals held, on remand from the United States Supreme Court in *Maryland v. King,* that the DNA search in that

## III.

■ The appellant contends the circuit court erred in deny-ing his second suppression motion, in which he sought to exclude oral statements he made to Sergeant Fetterolf. At the suppression hearing, Sergeant Fetterolf and the appellant testified as follows.

According to Sergeant Fetterolf, on May 18, 2010, he inter-viewed the appellant at the Baltimore County Detention Cen-ter, where the appellant was being held on charges unrelated to the Millers' home invasion. A detective with the Baltimore County Police Department was present during the interview, which took place in a 10–foot by 10–foot visiting room.

Sergeant Fetterolf testified that he entered the visiting room, where the appellant already was present, and intro-duced himself. He told the appellant he was investigating a case "where his name had come up." The appellant asked Sergeant Fetterolf why he was talking to him and how his name had come up. At that point, Sergeant Fetterolf read the appellant his *Miranda* rights,[8] including advising him that he could

> talk to a lawyer for advice before I question you and have him with you during questioning. If you cannot afford a lawyer and want one a lawyer will be provided for you at no cost. If you want to answer our questions without a lawyer present you will still have the right to stop answering at any time and request a lawyer.

---

case did not violate the defendant's right to be free from unreasonable searches and seizures under Article 26 of the Maryland Declaration of Rights. *King v. State* (On Remand), 434 Md. 472, 76 A.3d 1035 (2013). The Court adhered to its "traditional practice of construing Article 26 consistent with the Fourth Amendment. . . ." 434 Md. at 483, 76 A.3d at 1042.

Accordingly, even if the appellant were to have argued that his rights under Article 26 were violated in this case, the argument would not have had merit.

8. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The appellant responded by saying he did not know what this was about, that he had a lawyer, but that he would talk to the sergeant. The sergeant then said, "Okay. I'm sure gonna give you some paperwork when we are done here and I'm sure you should probably pass that along to your attorney."

The interview then commenced and lasted ten to fifteen minutes. In response to Sergeant Fetterolf's questions, the appellant denied ever having been in Prince George's, Charles, Calvert, or St. Mary's Counties. The appellant then said, "Well, I have been to the drag strip in Saint Mary's County because I did a paving job with my Dad's paving company. We resurfaced the asphalt." The appellant told the sergeant that that job had been "a couple years ago" and he had not been in St. Mary's County since.

Sergeant Fetterolf told the appellant that his DNA had been recovered from a pair of gloves near the scene of a home invasion in Charles County. In response, the appellant said, "You have the wrong guy" and then said, "I need to talk to my lawyer." According to the sergeant, the interview ended at that point.

The appellant testified that after he was read his *Miranda* rights he told Sergeant Fetterolf that he had a lawyer and that he "would like for him [the lawyer] to be here with me as far as for any questions and for him [the sergeant] to talk with my lawyer about anything he wishes to talk to me about." According to the appellant, notwithstanding this request, the sergeant proceeded to question him. The appellant denied telling the sergeant that he would talk to him even though he had a lawyer.

The court credited Sergeant Fetterolf's testimony, finding that, after being advised of his *Miranda* rights, the appellant said he had a lawyer, meaning in connection with the charges in Baltimore County, but also said that he would talk to the sergeant about whatever it was the sergeant was there to discuss. The court found that the appellant voluntarily answered the questions posed by Sergeant Fetterolf until "he saw the handwriting on the wall" and said he wanted to speak

to his lawyer; and at that point the interview was halted. Upon these findings, the court denied the motion to suppress the appellant's oral statements to Sergeant Fetterolf made during the interview (except that the appellant's statement at the end of the interview that he wanted to talk to his lawyer was not admissible).

Before this Court, the appellant argues that his remarks to Sergeant Fetterolf immediately after being advised of his *Miranda* rights constituted a request for counsel, and that, under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the sergeant was obligated not to proceed with any questions until the appellant's counsel arrived. Instead, Sergeant Fetterolf ignored his request for counsel and proceeded to question him, contrary to *Edwards*. The appellant maintains that the court made a clearly erroneous finding of fact by accepting Sergeant Fetterolf's account of what the appellant had told him.

The State counters that the appellant waived his *Miranda* rights immediately after being advised of them, by telling Sergeant Fetterolf that he had an attorney but would nonetheless talk to him. The State argues that because an invocation of the right to counsel must be clear and unambiguous under *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the court properly concluded that the appellant's statement was not such a request. Moreover, the State maintains that the court's decision to credit Sergeant Fetterolf's testimony was based on competent evidence, and was therefore not clearly erroneous.

In reviewing the denial of a motion to suppress, we look solely to the evidence before the court at the suppression hearing, and view that evidence in a light most favorable to the party that prevailed on the motion. *Gonzalez v. State*, 429 Md. 632, 647, 57 A.3d 484 (2012). "The credibility of the witnesses, the weight to be given to the evidence, and the reasonable inferences that may be drawn from the evidence come within the province of the suppression court." *Id.* at 647–48, 57 A.3d 484 (citing *Longshore v. State*, 399 Md. 486,

499, 924 A.2d 1129 (2007) ("Making factual determinations, i.e. resolving conflicts in the evidence, and weighing the credibility of witnesses, is properly reserved for the fact finder. In performing this role, the fact finder has the discretion to decide which evidence to credit and which to reject.")). We shall uphold the court's factual findings unless they are clearly erroneous. *Id.* at 647, 57 A.3d 484.

Here, the court accepted Sergeant Fetterolf's testimony that, after he advised the appellant of his *Miranda* rights, the appellant remarked that he had a lawyer in relation to the Baltimore County criminal case, but he would talk to the sergeant anyway. In support of its credibility determination, the court noted that the appellant voluntarily continued to answer questions even after he (supposedly) asked for his lawyer to be present. It also noted that the questioning ceased when the appellant asked to speak with his lawyer later on in the colloquy—a fact with which the appellant agrees—and found that it would be "illogical" for the sergeant to have ended the questioning then but to have ignored an earlier request for counsel.

Assessing the credibility of the sergeant's testimony was squarely within the court's discretion. The version of events the court adopted was in evidence, through Sergeant Fetterolf, so the court's findings were not clearly erroneous. *See Washington v. State,* 424 Md. 632, 651, 37 A.3d 932 (2012) ("[I]f there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous.") (quoting *Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109 (2004)). The court was entitled to credit Sergeant Fetterolf's testimony, if it found that testimony to be more believable than the appellant's testimony, which is what happened. Under Sergeant Fetterolf's version of events, the appellant did not invoke his right to counsel until the interview was underway, and when he did so, the interview was halted. In those circumstances, there was no *Edwards* violation. Accordingly, the court did not err in denying the appellant's motion to suppress his oral statement to Sergeant Fetterolf.

JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY CHARLES COUNTY.